964 So.2d 1167 (2007)
Don Frederick HANCOCK, Jr., Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KP-01569-COA.
Court of Appeals of Mississippi.
February 6, 2007.
Rehearing Denied June 26, 2007.
*1169 Don Frederick Hancock, Jr., appellant, pro se.
Office of the Attorney General by Deshun Terrell Martin, attorney for appellee.
Before MYERS, P.J., CHANDLER and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. Don Frederick Hancock, Jr. was indicted on June 21, 2004, as a habitual offender for the crime of armed robbery. Following his trial in the Circuit Court of Harrison County, First Judicial District, on June 23, 2005, Harrison was found guilty and sentenced to twenty-five years in the custody of the Mississippi Department of Corrections under section 99-19-81 of the Mississippi Code Annotated *1170 (Supp.2006). Aggrieved by the jury's finding, Hancock now appeals pro se and raises the following issues, listed verbatim:
I. IMPROPER AND MIS-LEADING JURY INSTRUCTION.
II. INEFFECTIVE ASSISTANCE OF COUNSEL / FAILURE TO OBJECT WHEN THE TRIAL COURT COMMITTED PLAIN ERROR BY ACTING AS AN ADVOCATE FOR THE STATE IN THE PRESENCE OF THE JURY / FAILURE TO OBJECT TO THE TRIAL COURT'S VIOLATION OF MISS. CODE ANN. § 99-17-35.
III. INEFFECTIVE ASSISTANCE OF COUNSEL / FAILURE TO CONDUCT AN ADEQUATE INVESTIGATION.
IV. INEFFECTIVE ASSISTANCE OF COUNSEL / FAILURE TO ARGUE MOTION IN LIMINE WHICH ALLOWED PLAIN ERROR TO STAND UNCORRECTED / FAILURE TO REQUEST CURATIVE INSTRUCTION.
V. INEFFECTIVE ASSISTANCE OF COUNSEL / FAILURE TO OBJECT TO IMPROPER REFERENCE TO STATE'S CLOSING ARGUMENT TO EVIDENCE NOT PRESENTED AT TRIAL.
Finding no error, the judgment of the trial court is affirmed.

FACTS AND PROCEDURAL HISTORY
¶ 2. Don Frederick Hancock, Jr., was indicted on the crime of armed robbery, as a habitual offender, on June 21, 2004. Specifically, Hancock was alleged to have robbed the Union Planters Bank in Gulfport, Mississippi. During Hancock's June 22, 2005 trial in the Circuit Court of Harrison County, First Judicial District, Marcella L. Shelby, the Union Planters's teller actually robbed, testified that a short time after eleven on the morning of December 10, 2003, she was approached by a heavyset, white male with a moustache and dark hair wearing a hat, glasses and wearing a dark top. She could not identify Hancock at trial as the robber because of his "disguise,"[1] but was confident that the robber threatened her with a gun. Another bank employee, Sonya Williams, testified that while she was not aware at the time that a robbery was occurring, she glanced at the robber and his hands but did not state whether she saw a gun. Finally, Williams and the bank manager testified that the robber stole around $7,300.
¶ 3. Thomas Nave, owner of the Deluxe Cleaners located next to the bank, was next to testify. He testified that as he left for lunch on December 10 he saw a man wearing a ball cap, dark top and black pants running from the bank towards a black pick-up truck parked behind the bank. When shown photographs of Hancock's later found truck, State exhibits nine and ten, Nave testified that the truck he saw the morning of the robbery was very similar. Finally, he testified that no one ever parks where the truck was parked and when he returned from lunch forty-five minutes later it was gone.
¶ 4. The day after the robbery, the Gulfport Police Department (GPD) provided a local newspaper with a description of the robber and a photo taken from the bank's surveillance system. GPD was soon thereafter contacted by Karen Ramsey, a leasing agent at the Maison D'Orleans Apartment complex in Biloxi, and Cynthia *1171 Curtis, the apartment manager. Ramsey testified that as soon as she saw the photo in the paper she immediately recognized the man in the photo as Hancock, one of the tenants of the apartment. She stated that she recently saw Hancock when she attempted to collect two months of past due rent from him. She also learned that his power had been shut off. Curtis testified that she remembered Hancock as a generally heavyset man with a moustache and that he drove a dark truck.
¶ 5. Once contacted by Ramsey and Curtis, Detective Adam Cooper of GPD proceeded to the apartment to serve a search warrant. Cooper testified that the search resulted in a photo of Hancock and a dark colored truck, but Hancock was nowhere to be found. Further questioning of the apartment employees revealed that the apartment was actually leased to his mother, Sarah Hancock, but she now lived in a RV park. Cooper testified that Ms. Hancock looked disappointed when shown the bank surveillance photo and she said it looked like her son. Cooper also testified that Ms. Hancock stated that Hancock was driving a dark colored truck that was titled in her name. Cooper then testified that Hancock's brother, who was present at Ms. Hancock's residence, stated that he also believed it was his brother in the photo. Cooper further testified that Ms. Hancock stated since Hancock's power had been disconnected at the apartment he had been living in hotels along the beach.
¶ 6. With this new information, on December 11, 2003, members of the GPD and Biloxi Police Department began searching for a dark colored truck at local hotels. Investigator Paul Cannette with the Biloxi Police Department was the first to spot Hancock's truck at the Broadway Inn in Biloxi. Cannette testified that after spotting the truck, he, along with two other officers, stopped at the hotel, and while the other officers were speaking with hotel management, Cannette kept watch over the truck. Hancock then exited a room close to Cannette and after recognizing him from bank photos, Cannette identified himself as law enforcement and ordered Hancock to place his hands on the truck. Cannette further testified that after having Hancock empty his pockets onto the truck he waited for GPD personnel to arrive. Cooper testified that Hancock had $805 in his possession when he was arrested. Cooper continued that on December 16, 2003, after Hancock had been given Miranda warnings, Hancock stated that the money they found him with was related to the charge against him and that he had actually committed the act of which he was charged.
¶ 7. Jennifer Taylor was next to testify at Hancock's trial. Taylor stated she ran an escort service under the name Misty Mars and Hancock employed her in December. She testified that she was with him some time before the robbery and the day after. She continued that both times he appeared to have money, but when she saw him after the robbery he had not only shaved his beard and moustache but also took her shopping with a "wad" of money, paid her $200 for her services, paid her a $100 tip and paid for the room at the Broadway Inn. Lastly, Taylor testified that Hancock drove a navy blue truck.
¶ 8. The State next called Matthew Burel. While he testified that he was not familiar with the area, Burel spent time with Hancock while they were in jail while Hancock was awaiting his trial on the armed robbery charge. Burel testified that Hancock confessed to the robbery and stated that "as long as he could, his retirement [would] come out the end of a gun barrel." Burel claimed that Hancock explained that he chose that particular bank because of its location and parked his *1172 truck by a fence between the back of the bank and a dry cleaners so it would not be noticed. Burel continued that Hancock stated that the teller he robbed was female and that he purposefully smudged his fingerprints so the police would not be able to identify him. Additionally, Burel testified that Hancock told him that he stole just under $8,000 and got rid of the gun he used somewhere between Biloxi and Ocean Springs. Furthermore, according to Burel's testimony, Hancock told him that after the robbery he spent time with a call girl named Misty Mars in hotels and they spent some money. Burel then testified that Hancock told him he was losing weight while in jail in order to "stump the jury." The State then asked Burel if he had seen any of the discovery materials sent to Hancock by his attorney. He responded that Hancock did show some of the materials to him but he saw nothing in detail. Finally, the State asked about any arguments Burel may have had with Hancock. Burel testified that while he and Hancock had "debates" from time to time, they never had an argument.
¶ 9. After the State rested, Hancock called Christopher Landry to the stand. Landry testified that he, Hancock and Burel were friends while in a restitution center. He further testified that while it was not an actual fight, Hancock "set Burel straight" in front of many of the center's compulsory guests. Landry testified that Burel later claimed he was going to get Hancock back for embarrassing him. Specifically, according to Landry, Burel said he was going to testify against Hancock to facts he knew were false and it would be his word against Hancock's.
¶ 10. After deliberating for two hours, the jury returned a verdict of guilty on the charge of armed robbery. On June 23, 2005, Hancock was subsequently sentenced to twenty-five years, day-for-day, in the custody of the Mississippi Department of Corrections. Aggrieved by this, Hancock now appeals. Additional facts will be discussed as needed.

ANALYSIS
I. WHETHER JURY INSTRUCTION S-2 WAS IMPROPER OR MISLED THE JURY.
¶ 11. This Court's standard of review for jury instruction issues is well-established. "When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed." Scott v. State, 878 So.2d 933(¶ 92) (Miss. 2004). "In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." Coleman v. State, 697 So.2d 777, 782 (Miss.1997) (quoting Collins v. State, 691 So.2d 918 (Miss. 1997)). There is no error "if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law. . . ." Scott, 878 So.2d at (¶ 92).
¶ 12. Hancock claims that jury instruction S-2 should not have been given as it spoke to the weight of the evidence and implied that a gun was unimportant to the State's case. Generally, the trial court should not comment on specific evidence, or the weight of said evidence, in the instructions given to the jury. Miss.Code Ann. § 99-17-35 (Rev.2000). Additionally, it is well settled that "[a]n instruction which is on the weight of the evidence or which singles out and gives undue prominence to certain portions of the evidence is erroneous." Bester v. State, 212 Miss. 641, 647, 55 So.2d 379, 381 (1951); see also *1173 Duckworth v. State, 477 So.2d 935, 938 (Miss.1985) (stating that jury instructions should not comment on or single out specific evidence).
¶ 13. In support of his argument, Hancock cites Mickell v. State, 735 So.2d 1031 (Miss.1999). In Mickell, the defendant was charged with armed robbery of a convenience store and the jury was also instructed on the lesser-included offense of robbery. During its deliberations over the fate of Mickell's charges, the jury requested clarification of the law in the form of a note which read, "can we convict a person of armed robbery without the policeman finding the gun or a gun?" Mickell, 735 So.2d at (¶ 5). Over objection, the circuit court responded, "yes." Id. After his conviction, Mickell appealed and argued that the court's answer of "yes" commented on the testimony and weight of the evidence. Id. The supreme court identified the central issue of the case as being whether Mickell had a gun, as the clerk who was robbed testified Mickell had a gun. Mickell took the stand and stated that he did not and the jury was instructed on the lesser offense of robbery. Id. at (¶ 10). In reversing Mickell's conviction and ordering a new trial the supreme court held,
The trial court's answer to the jury's question in the case sub judice impermissibly singled out the lack of specific evidence for particular attention by the jury and served to minimize the significance of the fact that no gun had been found by the police-an issue which was central to the case. The fact that the jury asked the question at all indicates that there may well have been jurors who had concluded that the State's failure to recover a weapon was sufficient to raise a reasonable doubt that the crime of armed robbery had been committed. A pronouncement by the trial court that such evidence was not essential to a conviction for armed robbery could easily have undermined a legitimate analysis of the strength of the State's proof. It is for this reason that judges are constrained from discussing the significance of any portion of the evidence.
Id. at (¶ 13).
¶ 14. Similarly, over Hancock's objection, instruction S-2 was read as follows, "[t]he Court instructs the Jury that it is not necessary that the State either recover or produce at trial the weapon alleged to have been used by the Defendant in this case." The circuit court's rationale in giving S-2 was explained in the following exchange.
HANCOCK'S ATTORNEY: Your Honor, I object on the basis that I think that misleads the jury.
THE COURT: In what way?
HANCOCK'S ATTORNEY: In that it tells them that in the defense's perspective that a weapon is not important to the issue of armed robbery.
THE COURT: Well, S-2, for the benefit of the record, reads, [instruction read]. So it reaffirms that a weapon was used.
And taken in conjunction with S-1, the requirement that the jury find beyond a reasonable doubt that the currency was taken from her person and against her will by virtue of her employment by putting Ms. Shelby in fear of immediate injury to her person by the exhibition of a deadly weapon, to wit, a handgun, I find the jury instructions, taken as a whole, properly instruct the jury that a handgun must have been used as the mechanism to place her in fear, and I'm going to give S-2.
¶ 15. The language of Mickell makes it clear that the instruction at issue has been deemed an impermissible comment on the evidence, and, as such, the *1174 trial court erred in allowing the instruction over objection. However, the facts of Mickell are distinguishable from the case sub judice and any resultant error stemming from the inclusion of instruction S-2 was harmless.
¶ 16. The supreme court has stated that "an error is harmless only when it is apparent on the face of the record that a fair minded jury could have arrived at no verdict other than that of guilty." Kolberg v. State, 829 So.2d 29(¶ 34) (Miss.2002) (quoting Carleton v. State, 425 So.2d 1036, 1040 (Miss.1983)). Error has also been deemed harmless "if it is clear beyond a reasonable doubt that it did not contribute to the verdict." Conley v. State, 790 So.2d 773(¶ 72) (Miss.2001) (citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
¶ 17. In Mickell, that a gun was never found by law enforcement was a central issue to the case as Mickell took the stand in his defense and testified that he did not even own a gun and the jury was instructed on the lesser offense of robbery. The Mickell court stated, "[a] pronouncement by the trial court that such evidence was not essential to a conviction for armed robbery could easily have undermined a legitimate analysis of the strength of the State's proof." Mickell, 735 So.2d (¶ 13). Such is not the case here. The jury in this case was presented with direct, uncontradicted testimony from Shelby, the bank teller, that the robber had a gun during the robbery. That no one else testified to the presence of the gun during the robbery is of no moment. Additionally, Hancock's counsel withdrew an instruction that would permit the jury to find Hancock guilty of simple robbery. Furthermore, evidence of Hancock's participation in the crime was substantial. While no bank employees or customers were able to identify Hancock in court, those that knew him immediately identified him from bank surveillance photos. The leasing agent of the apartment complex where Hancock had lived for a time recognized Hancock from a photo printed in a newspaper and the apartment manager verified that Hancock drove a dark colored truck. When Cooper visited Hancock's mother she looked disappointed when she saw the bank photo and said that it looked like her son. This identification was echoed by Hancock's brother as well. Taylor testified that she was with Hancock before and after the robbery. She continued that he had a moustache before December 10 but when she saw him the day after the robbery he was clean shaven. Additionally, she testified that he had a significant amount of money the day after the robbery and was generous enough to buy her clothes and offer a fifty percent tip for her services. This pecuniary wherewithal is in stark contrast to his apparent financial situation days before the robbery. Ramsey, the leasing agent at Hancock's apartment, testified that he was two months late on his rent and the power to his apartment had been disconnected. Many of these facts were verified by Burel, Hancock's jail-house confidant. Lastly, and most revealing, Hancock himself admitted that the money found in his possession when he was arrested at the Broadway Inn came from the robbery and, even more detrimental to Hancock's case, that he actually committed the robbery. As the evidence against Hancock was such that no fair minded juror could have arrived at any verdict other than guilty, this issue is without merit.
II. INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 18. Our standard of review when considering a claim of ineffective assistance of counsel is well established. As recently stated in Scott v. State, 938 So.2d 1233(¶ 25) (Miss.2006):

*1175 The standard for determining if a defendant received effective assistance of counsel is well established. "The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A defendant must demonstrate that his attorney's actions were deficient and that the deficiency prejudiced the defense of the case. Id. at 687[, 104 S.Ct. 2052]. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Stringer v. State, 454 So.2d 468, 477 (Miss.1984), citing Strickland v. Washington, 466 U.S. at 687, 104 S.Ct. 2052. The focus of the inquiry must be whether counsel's assistance was reasonable considering all the circumstances.
Id. (quoting Davis v. State, 897 So.2d 960(¶ 10) (Miss.2004)).
Furthermore, a strong presumption exists "that the attorney's conduct fell within the wide range of reasonable professional assistance." Carr v. State, 873 So.2d 991(¶ 27) (Miss.2004). "[C]ounsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy" and will not stand as support for an ineffective assistance of counsel claim. Id. (citing Cole v. State, 666 So.2d 767, 777 (Miss.1995)).
a. Failing to object when the trial judge questioned a witness in the jury's presence.
¶ 19. During the State's examination of Samuel Moore, an individual who had previously spent time in jail with Hancock, the following colloquy took place:
A. [Moore] Can I say something? I have nothing to say about this. I want to plead the Fifth or whatever.
Q. [State] Okay. Well, let me ask you this, Mr. Moore. Do you remember making a statement to Mark Hampel, Investigator Hampel?
A. No.
Q. You don't remember making that statement?
A. No, ma'am.
Q. Do you remember someone questioning you about what Mr. Hancock had told you about this?
A. Yeah. In Parchman.
Q. Okay. And do you remember telling them what he had told you?
A. No.
Q. You don't remember that?
A. No, ma'am. I have nothingyou know what I mean?
Q. Can you tell me why you're pleading the Fifth?
A. Because I really don't have nothing to say. I really don't remember. I don't remember nothing really. I was coming off drugs, So I don't remember nothing.
Q. Okay. And you weren't involved in this bank robbery?
A. I was in jail when it took place. I believe I met him after I was already sentenced. I was so bad on drugs, I really don'tif that's the dude right there, I really don't remember him.
Q. But you keep looking at him, right?
A. Well, that's him then.
Q. Okay. Now, is it not true that you told one of the other ADAs today that unless we cut your sentence and set *1176 you free you weren't going to tell what you knew?
A. No.
Q. You didn't say that?
A. Oh, I did, yes. I said, what could you do for me? And they said, nothing.
Q. All right. And so now you're refusing to tell what you know?
A. Yep.
Q. And do you remember Mr. Hancock telling you
A. No, I don't.
Q. that his girlfriend was involved in this robbery?
A. No, ma'am.
. . . .
Q. Do you remember Mr. Hancock telling you his girlfriend was involved in this?
A. No.
Q. You don't? You don't remember him talking to you about creating an alibi or anything like that?
A. No ma'am.
Q. None of that?
A. No, ma'am.
Q. You don't even remember having this conversation?
A. No, ma'am.
Q. And are you denying you told the investigator at Parchman this statement?
A. I believe so, yes ma'am.
Q. And that's because you just don't want to tell anybody and you want to get out of jail?
A. No. I got my sentence. I'm fine with it. But I don'tyou know what I mean? If it's the truth, I say it. If it isn't, thenyou know what I mean? Everything you asked me so far I said the truth to.
THE COURT: Let's hold on just a minute. Ms. Dodson, do you have [a] copy of the statement that he gave to the authorities?
THE STATE: I have a summary of it, Your Honor.
THE COURT: Hand it to Mr. Moore. Allow him to review it. Read it to yourself, Mr. Moore.
THE WITNESS: (Reviews Document) I don't remember that, and I didn't sign that, sir.
THE COURT: Just a second. Just a second. Mr. Moore, having read that statement and refreshed your recollection or given you the opportunity to refresh your recollection, I need to advise you at this point that you have no right to claim the Fifth Amendment. You are not a suspect. You are not charged with anything. You aren't
THE WITNESS: Oh, okay.
THE COURT: Let me finish my statement, Mr. Moore, because you really need to understand what I'm about to tell you. It's important you listen to me for a minute. You have no Fifth Amendment right to refuse to answer Ms. Dodson's questions. Given that they allege, the State alleges, that you have made a statement to law enforcement, what they're going to do right after you claim that you have no memory of this is put the officer up there. And if the officer testifies that you made these statements to him and swears under oath that you told these things to him, you are then subject to the penalty of perjury given that you're now sitting there under oath and an additional ten-year sentence.
THE WITNESS: Okay.
THE COURT: So what I'm going to do is send the jury out for about two or three minutes and let you stretch your *1177 memory and see if it comes back to you, Mr. Moore.
At this point the jury was excused and Moore was further allowed to refresh his recollection and again advised of the consequences of failing to answer the questions asked of him truthfully. Additionally, Hancock's attorney did, in fact, make an objection outside the presence of the jury, albeit a cautious one. He stated, "I'd just like to object to the manner in which it's being done in that it appears to me that he's being pressured into [testifying]."
¶ 20. Hancock claims his attorney, James Evans, was ineffective in failing "to object when the trial court displayed bias against Hancock" in acting as an advocate for the State and violating Miss.Code Ann. Section 99-17-35 (Supp.2006), and the prejudice he suffered as a result of this lack of an objection changed the outcome of the trial. Hancock cites Brent v. State, 929 So.2d 952 (Miss.Ct.App.2005); West v. State, 519 So.2d 418 (Miss.1988); Nichols v. Munn, 565 So.2d 1132 (Miss.1990); Thompson v. State, 468 So.2d 852 (Miss. 1985); Jones v. State, 669 So.2d 1383 (Miss.1995) for support of his claim that failing to object was ineffective assistance of counsel, however, none of the cases cited by Hancock pertain to ineffective assistance of counsel. Hancock also cites Stallworth v. State, 310 So.2d 900 (Miss. 1975) in support of his proposition that his attorney provided ineffective assistance by failing to object to the trial court's claimed violation of Section 99-17-35. Again, Stallworth does not speak to ineffective assistance of counsel.
¶ 21. Despite Hancock's claims, it is clear that Evans objected to the trial court's alleged involvement during Moore's testimony. Furthermore, the trial court's advisement of Moore is clearly distinguishable from the cases Hancock cites in support of his argument, and while, in most cases, trial courts would be well advised to excuse the jury before questioning or advising a witness, the trial court's actions in the case sub judice can hardly be said to exhibit bias or advocacy for the State. In Brent, the court questioned a witness pertaining to substantive issues surrounding the case. Brent, 929 So.2d at (¶ 8). The trial court in West actually assisted the prosecution in what the supreme court referred to as "coaching the district attorney." West, 519 So.2d at 420-21. In Nichols, the trial court displayed obvious and unwarranted distrust of a witness's response and heavily questioned another witness at the completion of cross-examination. Nichols, 565 So.2d at 1133, 1135. Similarly, once the prosecution and defense were finished with a witness, the court in Thompson further questioned the witness exhibiting his approval of the witness and her testimony. Thompson, 468 So.2d at 854. Finally, in Jones, the supreme court without condemning the trial courts actions, noted that its colloquy was conducted outside the presence of the jury. Jones, 669 So.2d at 1387.
¶ 22. In the case before this Court, Moore testified that he was not telling what he knew. The trial court did not question him regarding substantive testimony, but only advised him of the consequences of his admitted perjury. The risk of influencing the jury in terms of the trial court's disposition regarding Moore and his testimony was nonexistent as it was obvious that Moore was being purposefully forgetful, and it was for this reason alone that he was cautioned. Furthermore, the trial court's actions did not violate Section 99-17-35. In Stallworth, the supreme court reversed the judgment of the lower court based upon the trial court's warning to a witness not to tell a lie. Stallworth, 310 So.2d at 901. The witness's testimony was in conflict with other testimony given *1178 during the trial and the supreme court reasoned that by bringing attention to the truthfulness of the witness's testimony the trial court commented on the testimony. Id. Unlike Stallworth, there was no testimony given that conflicted with Moore's and, again, Moore admitted to perjury. Therefore, as Hancock's attorney did object to the trial court's actions and, even had he not, such actions would not have constituted error, this issue is without merit.
b. Failure to conduct an adequate investigation of discovery material.
1. Failure to object to the introduction of evidence.
¶ 23. During the State's case-in-chief, Detective Sean Dunagan testified that he was one of the officers that searched Hancock's truck after he was found at the Broadway Inn. During his testimony the State asked Dunagan to identify four items of clothing that were found during the search of the truck so they could be admitted into evidence. Without objection, the State introduced a pair of brown shoes, a Henley style shirt and a blue Hanes T-shirt. When the State attempted to introduce a pair of blue jeans, the final article of clothing, Hancock's attorney objected based upon the claim that the jeans were not mentioned on any evidence list provided by the State during discovery. After both sides argued their relative points, the trial court sustained Hancock's objection based on the fact that the jeans were not listed on any evidence list or property invoice given during discovery. During argument over the objection, Evans stated that he did not see the shoes, jeans or Henley style shirt on any evidence lists either. Based on this, Hancock claims that Evans failure to object to the introduction of those items was ineffective assistance of counsel.
¶ 24. Even if Hancock could support a finding that Evans's performance was deficient in failing to object to the introduction of the items recovered from his truck, he must still show that but for his counsel's errors, there is a reasonable probability that the outcome of his trial would have been different. The probability of a different outcome is reasonable if it is "sufficient to undermine confidence in the outcome." Cole v. State, 666 So.2d 767, 775 (Miss.1995). This determination must be made based upon a totality of the circumstances. Eakes v. State, 665 So.2d 852, 863 (Miss.1995). Even without the introduction of the clothes, the record is replete with evidence of Hancock's guilt. He was identified from the bank photos by his apartment leasing agent and manager as well as by his own mother and brother. Hancock's truck matched the description of the truck Nave saw parked behind the bank. Testimony from Taylor indicated that his appearance before the robbery matched that shown upon the bank photos and that Hancock had changed his appearance since the robbery occurred. Additionally, she testified that he had a substantial amount of money when she saw him after the robbery. Burel testified that Hancock admitted to the bank robbery and supplied a great deal of detail surrounding the crime. Finally, Cooper testified that Hancock stated he committed the robbery. Based upon the overwhelming evidence against Hancock, we cannot say that absent the introduction of the clothing the result of the trial would have been different. As such, this issue is without merit.
2-3. Failure to object to false testimony.
¶ 25. Hancock next argues that Evans should have objected to Cooper's testimony regarding Hancock's apparent confession of the robbery and claim that *1179 the money found on his person at the time of arrest came from the robbery as "the discovery file contained two documents clearly stating Hancock never confessed and that Hancock stated the money came from drug sales." However, the record is void of those documents Hancock claims contains information contrary to Cooper's testimony, and, in fact, is void of any hint of doubt as to the truth of Cooper's testimony. As such, there is nothing in the record to indicate that an objection regarding Cooper's testimony would have been proper. Therefore, this issue is without merit.
c. Failure to argue a motion in limine or request a curative instruction.
¶ 26. Hancock next argues that he received ineffective assistance of counsel as a result of Evans's failure to argue a motion in limine requesting the trial court to restrict counsel for the State and all State witnesses from mentioning any crime Hancock may have committed other than the current armed robbery charge. Hancock continues that as a result of Evans's failure to argue the motion Burel testified, without solicitation from the State, as follows:
Q. All right. Tell me what [Hancock] told you about the armed robbery, about this one in December of 2003.
A. He explained how he did it, that he's got experience with the bank robberies from his prior record.
MR. EVANS: Your Honor, I object.
THE COURT: Sustained
At the conclusion of the State's questioning of Burel, the jury was removed and Evans requested a mistrial as a result of Burel mentioning Hancock's prior record. In denying the motion for mistrial, the trial court stated:
THE COURT: What allegation of prior history? Your original motion said because of his prior convictions. There's no reference to any convictions. There certainly was no solicitation by the State of any prior convictions. The question from the State at least was what he told you about this robbery. The witness's response was not completely responsive, albeit he said, he told me that he had experience with bank robberies based on his prior record. Record to you and I in this setting typically means record of conviction. I don't know that that's what it necessarily means to the jury. It may mean his track record, his record around the community, his record of offenses. It could mean a number of things that we're not permitted to speculate on.
Hancock further argues that Evans's failure to request a curative instruction pertaining to Burel's statement was also ineffective assistance of counsel.
¶ 27. While Burel did testify as to Hancock's "prior record," we would agree with the trial court that such testimony is ambiguous at best in the eyes of most jurors. "Where the witness refers briefly to another crime, and the testimony was not purposely elicited by the district attorney to prove the defendant's character, no reversible error occurs." Hobson v. State, 730 So.2d 20(¶ 10) (Miss.1998). Burel made no mention of any specific prior convictions or crimes, but only made reference to Hancock's experience. As the statement did not educate the jury on Hancock's criminal history, it could not have tainted the jurors's view of the overall case against Hancock, and, as such, did not prejudice his defense. Therefore, even assuming Evans was deficient in failing to argue the motion in limine, Hancock has failed to show any prejudice as a result. This issue is without merit.
*1180 ¶ 28. Hancock's claim that Evans was deficient in not requesting a curative instruction is also without merit as that decision falls squarely within the realm of trial strategy. While Burel's statement was not immediately prejudicial, caution by the trial court may have sparked the juror's attention and inadvertently brought undue consideration of an otherwise harmless statement.
d. Failure to object during the State's closing argument to reference to evidence not presented at trial.
¶ 29. Hancock's final claim of ineffective assistance of counsel concerns Evans's failure to object when the prosecution made reference during its closing argument to a hat found during the search of Hancock's truck when no such hat was ever found. As evidence of the effect the prosecution's statement had upon the jury, Hancock calls attention to a note the jury sent the trial judge inquiring about the statement. The note stated, "What was Mr. Evans [sic] statement in closing arguments in reference to the hat," to which the judge responded, "You have all the evidence and instructions of law. Please continue your deliberations." A similar claim was made in Jackson v. State, 860 So.2d 653 (¶ 79-80) (Miss.2003). In Jackson, the prosecutor stated during closing arguments that Jackson had been previously convicted of kidnaping. Id. In fact, Jackson had not been convicted of kidnaping, but only burglary with the intent to commit kidnaping. Id. In finding that the prosecutor's misstatement was not prejudicial, and in turn that Jackson was not prejudiced by his attorney's failure to object to the statement, the Jackson court noted that the jury had been supplied with a certified copy of the actual conviction as evidence of the inaccuracy of the prosecution's statement. Id.
¶ 30. In the case sub judice, the prosecutor's actual statement was, "And in the search of the truck you have the evidence items here, a blue-gray Henley shirt, blue tee shirt, and cap." The jury was obviously confused by the statement as there was no cap presented or offered into evidence. Additionally, Cooper was again called to the stand as the last defense witness and he testified that a hat was never recovered. The jury's note is evidence of this confusion and not prejudice to Hancock. In fact, the note indicates that the jury was acutely aware of the State's misstatement and questioned the court for clarification. The trial court's response informing the jury that they had all evidence before them solidified its understanding of the misstatement as there was no hat present among the evidence and testimony from one of the officers that conducted the search of Hancock's truck indicated that no hat was ever recovered. As in Jackson, Evans failure to object during closing does not demonstrate, in the face of the jury's note, the lack of a hat in evidence and Cooper's testimony, that Hancock was prejudiced. Therefore, even if Evans's failure to object could be characterized as deficient, the result of a lack of objection did not prejudice Hancock, thus prohibiting him from proving the second prong of Strickland. As such, this issue is without merit.
¶ 31. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY, FIRST JUDICIAL DISTRICT, OF CONVICTION OF ARMED ROBBERY AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER UNDER SECTION 99-19-81 OF THE MISSISSIPPI CODE ANNOTATED IS AFFIRMED. ALL COSTS OF THIS *1181 APPEAL ARE ASSESSED TO HARRISON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] The disguise Shelby referred to was a hat, glasses, and moustache. The day of trial Hancock was clean shaven.