CARLTON, J.,
for the Court:
¶ 1. Jeffrey Kleckner was indicted by a grand jury of Union County in October 2008 for three counts of the sexual battery of AB,[1] and one count of touching AB for lustful purposes. Kleckner was tried and convicted of all four charges. The Union County Circuit Court sentenced Kleckner to three concurrent life sentences for his sexual-battery convictions and to a consecutive fifteen-year sentence for his conviction for touching a child for lustful purposes. All sentences were ordered to be served in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for parole.
¶ 2. On appeal, Kleckner raises the following assignments of error, which we quote:
I. Whether [he] was denied his Sixth Amendment right to effective assistance of counsel, and hence federal and state due process rights to a fair trial, under “Cronic ”;
II. Whether [he] was denied his Sixth Amendment and Article 3, Section 26 rights to effective assistance of counsel, and hence due process rights to a fair trial, under “Strickland ”;
III. Whether the trial court’s denial of [his] first motion for a continuance, when he was hospitalized with acute coronary syndrome, acute renal failure and other serious medical issues, denied him his Sixth Amendment and Article 3, Section 26 rights to effective assistance of counsel, and hence federal and state due process rights to a fair trial;
IV. Whether the trial court’s failure to have the in-chambers hearing on [his] motion for a continuance violates [his] due process rights;
V. Whether the State’s withholding of evidence material to the officer-written confession (jail medical records demonstrating it knew of [his] medical conditions on the day the confession was penned), and interference by an [assistant district attorney] formerly associated with the case by unnoticed, ex parte contacts to [his] medical providers, violated [his] due process rights under the Fourteenth Amendment and Section 14 of the Mississippi Constitution;
VI. Whether the misconduct of the [assistant district attorney] formerly associated with the case, specifically her ex parte and unlawful actions on Septem *1077 ber 14, 2009, violated [his] due process rights under the Fourteenth Amendment and Section 14 of the Mississippi Constitution;
VII. Whether [his] Fifth Amendment and Section 26 rights were violated when the arresting officer continued to question him after [he] asked him to stop;
VIII. Whether [his] rights to a speedy trial under the Sixth Amendment, Section 36 of the Mississippi Constitution, and the 270-day statutory rule were violated;
IX. Whether the trial court erred by permitting a so-called “forensic” interviewing “expert” to testify when [AB] had already testified, and if not, whether it erred by failing to give a limiting instruction on the weight to be accorded the “expert’s” testimony;
X. Whether [his] Fourth Amendment rights were violated when the arresting officer entered the home of a third party without a search warrant;
XI. Whether Juror No. 48’s failure to reveal the fact that her mother was a key employee of the Union County Sheriff, during voir dire, denied [him] his fundamental right to a trial by a fair and impartial jury;
XII. Whether the trial court’s failure to remove a juror who spoke with [AB’s uncle] after the jury was empaneled denied [him] his fundamental right to a trial by a fair and impartial jury;
XIII. Whether the trial court’s failure to conduct a hearing as to the admissibility of the officer-written confession, and subsequent admission thereof, violated [his] Fifth Amendment and Section 26 rights;
XIV. Whether the prosecution’s closing argument, referring to [his] invocation of his right to remain silent, appealing to localism, and inflaming the jury’s passions violated [his] Fifth Amendment and Section 26 rights, due process rights to a fair trial, and fundamental right to an impartial jury;
XV. Whether admission of the Justice Court Affidavits, the arresting officer’s report, and arrest warrants into substantive evidence, without a limiting instruction, violated [his] Fifth Amendment, Fourteenth Amendment, Section 14 and Section 26 rights;
XVI. Whether the trial court’s sentencing of [him] to the maximum sentences on all four (4) counts, including three (3) life sentences without the possibility of parole, without a sentencing hearing violated his due process rights;
XVII. Whether the trial court’s sentence of three (3) consecutive life sentences, the statutory maximum, with an additional 15 years to serve, the statutory maximum, all without the possibility of parole, violates the Eighth Amendment and/or Section 28;
XVIII. Whether the supplemental jury instruction to the jury in response to its question, directing the jury to the indictment as the “charging document” without explaining again that the indictment was to be afforded absolutely no eviden-tiary weight, and by characterizing the “Justice Court affidavits” as “exhibits to testimony only,” without explaining that said affidavits carried no evidentiary weight, violated his due process rights;
XIX. Whether the legally introduced evidence was sufficient to support [his convictions];
XX. Whether the trial court erred in ruling it did not have jurisdiction to hear the URCCC 2.01 motion; and
XXI. Whether the cumulative weight of errors requires reversal.
¶ 3. Finding each assignment of error without merit, we affirm.
*1078 FACTS
¶ 4. AB confided to her cousin, Whitney Grose, that Jeffrey Kleekner, AB’s cousin, had sexually assaulted her on numerous occasions during the past several years. The Union County Sheriffs Department was contacted, and it began an investigation. Angie Floyd, a forensic-interview specialist with the Children’s Advocacy Center in Tupelo, Mississippi, interviewed AB on September 9, 2008. Floyd, who was accepted as an expert in child forensic interviewing, testified that AB “disclosed abuse and that she did appear to be consistent with that of a child [who] had been sexually abused.”
¶ 5. According to the testimony of Roger Garner, an investigator with the Union County Sheriffs Department, Kleekner was arrested at his girlfriend’s home in Blue Mountain, Mississippi. Investigator Garner testified that Kleekner gave a written statement to the police after waiving his rights. Investigator Garner read Kleckner’s statement to the jury at trial:
“During the summer of 2006 after I got laid off from the furniture factory, I had too much time on my hands. [AB] had come up to my shop on County Road 121 and talked about stuff — the cars, school, boys, and her dad’s dogs. The first time I touched her we were in the house playing cards. She is an aggressive and curious girl. I was alone and thinking about stuff and I started to talk to her. I touched her breasts and nipples. I then touched her vagina and I put my finger inside her and rubbed it around. I can’t remember if I moved my hand or if she reached for my penis, but she touched my erect penis and I was aroused. I don’t know if I made her climax or not. I didn’t, I don’t think, but the first time she reached out and touched my penis. I remember at one time in the car that I touched her vagina area inside her thigh, but nothing else happened that time. I don’t think there were any other times. I told her that she should be careful of boys that might take advantage of her and do more to her. I did not want her to hate me. After this stuff happened, I just stay [sic] away from the family. About a month or so ago, I called to ask about the zoo, but she did not answer.” He indicated he called her on the phone and she didn’t answer the phone. “I have seen her recently, but I try not to hang around.”
¶ 6. Chris Aldridge, a Baptist minister and sworn commissioned deputy to serve as chaplain, was present during Kleckner’s arrest and subsequent interview at the Union County Jail. Aldridge testified that he observed Investigator Garner give Kleekner his Miranda warnings at his time of arrest. According to Aldridge, Investigator Garner also read Kleekner his rights once at the police station, and Kleekner signed the waiver-of-rights form. Aldridge also identified the statement read by Investigator Garner as having been made by Kleekner.
PROCEDURAL HISTORY
¶ 7. On October 21, 2008, a grand jury before the Union County Circuit Court returned a multi-count indictment charging Kleekner with three counts of sexual battery in violation of Mississippi Code Annotated section 97-3-95(l)(d) (Rev. 2006) and one count of touching a child for lustful purposes in violation of Mississippi Code Annotated section 97-5-23 (Rev. 2006). On April 27, 2009, Joe T. Gay, entered an appearance as defense attorney for Kleekner. A trial by jury subsequently was held on September 16-18, 2009, and a jury convicted Kleekner on all four counts. The trial court then sentenced Kleekner to three concurrent life sen *1079 tences for the sexual-battery convictions and to a consecutive fifteen years for his conviction for touching a child for lustful purposes, all without the possibility of parole, in the custody of the MDOC. Kleck-ner filed a motion for judgment notwithstanding the verdict (JNOV) and, in the alternative, a motion for a new trial, which the trial court denied. On October 14, 2009, Kleckner filed an appeal.
¶ 8. On December 8, 2009, Gay, Kleck-ner’s trial counsel, withdrew as counsel for Kleckner, and new counsel, Gregory M. Hunsucker, entered an appearance. Subsequently, on February 18, 2010, Kleckner filed in the trial court a “Motion to Correct and Enlarge the Record,” an “Extraordinary Motion for New Trial,” and a “Request to Clerk for Juror Information.” Kleckner then filed a M.R.A.P. 10(e)/21(e) petition with this Court, seeking oral argument on the petition and leave for the trial court for conduct an evidentiary hearing on the pending motions or, alternatively, correction and expansion of the record. This Court granted Kleckner’s motion in part, remanding the case to the trial court for consideration as to whether the record should be supplemented or corrected.[2]
¶ 9. Subsequently, on June 11, 2010, Kleckner filed a “URCCC 2.01 Motion and for Other Relief’ in the trial court.[3] The trial court ultimately concluded that it lacked jurisdiction to hear the motion in light of this Court’s remand order. On June 21, 2010, the trial court held a post-remand hearing on Kleckner’s motion to correct and enlarge the record. Subsequently, the trial court ordered a supplementation of the record for the limited purpose of supporting Kleckner’s claim of ineffective assistance of counsel on appeal. Kleckner then filed an “Amended Designation of Record” in the trial court and subsequently his appellate brief in this Court.
¶ 10. Additional facts, as necessary, will be discussed during our analysis and discussion of the issues.
DISCUSSION
¶ 11. Kleckner raises a majority of his issues for the first time on appeal. “Generally, a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because otherwise it is procedurally barred.” Parker v. State, 30 So.3d 1222, 1227 (¶ 14) (Miss.2010). “Plain error exists where such error affects the defendant’s substantive/fundamental rights, even though no objection was made at trial.” Id. Thus, where Kleckner’s substantive and fundamental rights are affected, this Court will apply the plain-error doctrine in reviewing the alleged errors. Also, as many of Kleckner’s issues are interrelated, we will combine them for efficiency’s sake.
¶ 12. Kleckner argues that the trial court’s failure to have the in-chambers hearing on his motion for a continuance violates his due-process rights; the supple *1080 mental jury instruction in response to the jury’s question violated his due-process rights; and the trial court erred in ruling it did not have jurisdiction to hear the Uniform Rule of Circuit and County Court 2.01 motion. Kleckner, however, fails to cite authority to support these assignments of error. “Failure to cite relevant authority obviates the appellate court’s obligation to review such issues.” Taylor v. State, 754 So.2d 598, 603-04 (¶ 12) (Miss.Ct.App.2000). Consequently, this Court is permitted to disregard these issues on appeal. Id.; see Edlin v. State, 533 So.2d 403, 410 (Miss.1988) (holding that “[i]t is the duty of the appellant to overcome the presumption of the correctness of the trial court’s judgment by demonstrating some reversible error”). Therefore, we proceed to Kleckner’s remaining issues before the Court.
I. MOTION FOR CONTINUANCE[4]
¶ 13. Kleckner’s multi-count indictment was filed on October 21, 2008. Gay, who represented Kleckner during the trial proceedings, entered an appearance on April 27, 2009. Gay filed several motions for discovery that same day. Kleckner was scheduled for trial on September 14, 2009. On September 11, 2009, Kleckner was admitted to Oxford Baptist Hospital where he remained until being discharged on September 15, 2009. On September 14, 2009, defense counsel made an ore tenus motion for a continuance. A hearing occurred in chambers, but no record was made. The trial was postponed until September 16, 2009. At the beginning of the trial on September 16, defense counsel announced to the court, “We are ready, Your Honor.”
¶ 14. Kleckner argues that he was not given adequate time to prepare for trial due to Kleckner’s hospitalization because the trial court denied Gay’s ore tenus motion for a continuance.[5] Kleckner also claims that the motion for continuance should have been granted because neither Gay nor the trial court knew at the time of the motion about an alleged unlawful ex parte hospital visit by the assistant district attorney formerly associated with the case to the hospital on the morning of September 14, 2009.[6] Further, Kleckner asserts that the alleged misconduct of the assistant district attorney violated his due-process rights. Gay also argues that the trial court’s failure to grant the continuance on these facts constitutes plain error, even *1081 though Gay filed no procedurally proper written motion below and the record is void of any denial by the trial court of a further continuance.
¶ 15. The decision to grant or deny a motion for a continuance falls within the sound discretion of the trial court. McFadden v. State, 929 So.2d 365, 369 (¶ 16) (Miss.Ct.App.2006). This Court will only reverse “when manifest injustice appears to have resulted from the decision to deny the continuance.” Hilliard v. State, 42 So.3d 653, 655 (¶ 7) (Miss.Ct.App.2010) (quoting Watson v. State, 991 So.2d 662, 667 (¶ 13) (Miss.Ct.App.2008)).
¶ 16. “The question of whether defendant had a reasonable opportunity to prepare to confront the State’s evidence at trial depends upon the particular facts and circumstances of each case.” Reuben v. State, 517 So.2d 1383, 1386 (Miss.1987). In this case, Kleckner and Gay, his trial counsel, had from April 2009 until September 2009 to prepare for trial. Gay, at the post-remand hearing, testified that he “prepared some months in advance because it was preset one time,” and he testified to meeting with Kleckner for approximately two-and one-half hours on September 9, 2009. Further, the record fails to demonstrate that the assistant district attorney acted in a manner that violated Kleckner’s constitutional rights. Instead, the record shows that defense counsel announced that the defense was ready for trial. After reviewing the record, we cannot find that the trial court abused its discretion in denying Kleck-ner’s motion for a continuance. There has been no showing of manifest injustice. See Stack v. State, 860 So.2d 687, 692 (¶ 9) (Miss.2003) (noting that the Mississippi Supreme Court has upheld numerous denials of motions for continuance where the defense counsel had a limited amount of time to prepare for trial). This issue is without merit.
II. CONFESSION[7]
¶ 17. Kleckner argues that the trial court erred in admitting his officer-written confession without holding a hearing, and that the State failed to meet its burden by showing through expert medical testimony that Kleckner was able to give a knowing and voluntary waiver and confession. Kleckner also contends that the State committed a Brady[8] violation by failing to disclose exculpatory evidence relevant to the State’s knowledge of his medical condition at the time the officer-written confession was penned. Kleckner contends that in light of these constitutional errors, allegedly arising to the level of plain error, he should be granted a new trial. After reviewing the record, we find no merit to these allegations.
A. Admissibility of Confession & State’s Burden
¶ 18. Kleckner argues that the trial court was required to hold an evidentiary hearing to determine if his statement should have been suppressed. As noted by the State, Kleckner is essentially arguing that the trial court has the duty to conduct a suppression hearing sua sponte. This Court has held that “[wjhen a criminal defendant objects to the admission of his confession, arguing it was involuntary, the trial court must conduct a hearing outside the presence of the jury. At the hearing, the burden is on the State to prove voluntariness beyond a reasonable doubt.” Pinkston v. State, 50 So.3d 1027, 1029 (¶ 8) (Miss.Ct.App.2010) (emphasis added and internal citations omitted). In *1082 this case, the record shows that Kleckner failed to move to suppress his statement or to otherwise request the trial court to conduct a pretrial hearing on the voluntariness of the confession. As such, this issue is without merit.
B. Brady Violation
¶ 19. Kleckner argues that in responding to his discovery requests, the State failed to disclose exculpatory evidence of his medical condition[9] at the time he gave his statement to Investigator Garner. Kleckner claims that such conduct constitutes a Brady violation.
¶ 20. “In Brady, the United States Supreme Court held that ‘the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.’” Thomas v. State, 45 So.3d 1217, 1220 (¶ 9) (Miss.Ct.App.2010) (quoting Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). This Court has held:
To establish a Brady violation a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (8) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.
Id. (quoting King v. State, 656 So.2d 1168, 1174 (Miss.1995)).
¶ 21. Further, under prong four, “[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Id. at (¶ 10) (quoting Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)). “A ‘reasonable probability' of a different result is accordingly shown when the government’s evi-dentiary suppression ‘undermines confidence in the outcome of the trial.’” Id.
¶ 22. After reviewing the record, we find that Kleckner failed to prove that a Brady violation occurred. Kleckner fails to demonstrate that he satisfies even the first and second Brady factors, which require proof that the defendant did not possess the evidence and could not have obtained the evidence through reasonable diligence. Kleckner was aware of his medical condition at the time he gave his statement, of which he could have advised his trial counsel if his condition had affected his ability to give a voluntary statement. After receiving this information, Kleck-ner’s counsel could have made a specific discovery request or could have filed a motion to compel his jail medical records. Furthermore, since Kleckner failed to adequately present the voluntariness issue to the trial court prior to trial, the issue was not before the trial court, and there was no reason for the State to believe that his jail medical records were relevant, much less exculpatory. Based on the foregoing, Kleckner’s argument is without merit.
III. RIGHT TO REMAIN SILENT AND RIGHT AGAINST UNREASONABLE SEARCH AND SEI *1083 ZURE[10]
¶ 23. Kleckner argues that the arresting officer, Investigator Garner, violated his Fifth Amendment rights by continued questioning after Kleckner asked Investigator Garner to stop during the interrogation and when Investigator Garner commented during his trial testimony on Kleckner’s right to remain silent. Additionally, Kleckner asserts that Investigator Garner violated his Fourth Amendment rights when he seized him in a third party’s home without a search warrant. Kleckner asserts that these actions constituted plain constitutional error, which requires reversal of his case. We will address each of Kleckner’s assignments of error in turn.
A. Kleckner’s Invocation of the Right to Remain Silent
¶ 24. Kleckner contends that the admission of the officer-written confession was plain error requiring reversal because Investigator Garner continued to question him after he had asserted his right to remain silent. We find no merit to this argument.
¶ 25. In addressing a similar application of the request for counsel, the Mississippi Supreme Court, quoting the United States Supreme Court, stated as follows:
We held in Miranda[ v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] that a suspect is entitled to the assistance of counsel during custodial interrogation even though the Constitution does not provide for such assistance. We held in Edwards that if the suspect invokes the right to counsel at any time, the police must immediately cease questioning him until an attorney is present. But we are unwilling to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue.
Barnes v. State, 30 So.3d 313, 316-17 (¶ 9) (Miss.2010) (quoting Davis v. United States, 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)).
¶ 26. In describing his interview with Kleckner, Investigator Garner testified that Kleckner told him that he fondled the victim and placed his fingers inside her vagina. Investigator Garner testified that he asked Kleckner if he licked the victim. Kleckner replied that he did not think he needed to say anything else but, then again “[there are] two sides to everything.” Investigator Garner testified that he asked Kleckner again, and Kleckner indicated that he did not want to say anything further. Investigator Garner testified that he then stopped the interview.
¶ 27. As evidenced above, Kleckner failed to make an unambiguous, unequivocal assertion of his right to remain silent, and the officer was not compelled to stop the questioning. Barnes, 30 So.3d at 318 (¶ 15) (“Pursuant to Davis, Barnes failed to make an unambiguous, unequivocal request for an attorney, and Lewis had no obligation to stop questioning her.”). The officer asked Kleckner about one act the victim said he had committed, and Kleck-ner said he did not want to answer any more questions. The officer asked the question again and then ended questioning. There was no violation of Kleckner’s right not to give evidence against himself, and, even if there had been, the one allegedly inappropriate question did not yield any evidence. Kleckner had already given the information that incriminated him before he said that he did not want to answer any more questions. This issue is without merit.
*1084 B. Investigator Garner’s Comment on Kleckner’s Right to Remain Silent
¶ 28. Kleckner argues that constitutional plain error occurred in violation of his fundamental right to remain silent when Investigator Garner improperly testified concerning Kleckner’s invocation of his right to remain silent. Kleckner takes issue with portions of Investigator Garner’s testimony during both direct examination and cross-examination.
¶ 29. During direct examination of Investigator Garner by the State, the following exchange occurred:
Q: In his initial statement to you, did he make any statements about, and I hate to be blunt, but any licking?
A: Yes, sir.
Q: In the initial statement?
A: The child’s initial statement, yes.
Q: Mr. Kleckner, in his statement, did he relay to you the series of events that he licked her?
A: No. I asked about it because I knew about that from the statement of the child, so I did ask him about that specifically.
Q: When you asked him about that specifically, what happened at that point?
A: Well, at that point is when he told me, he said, Look. I don’t think I need to say anything else, but again, there’s two sides to everything. I said, That’s fine. I did ask him again and he indicated that he did not want to say anything further.
Q: What did you do at that time?
A: That’s why on this second page it stops just after a few sentences and then this X is put across here. He initialed it on the end and then I initialed it on these fines and he initialed it on these fines which indicates that the statement stopped here.
Q: And the statement stopped when you began asking him pointed questions about things?
A: When I began to ask him about pointed questions about things that I had discovered in the interview with the child, then that’s when he decided to stop, and he has a right to do that just like it says in the waiver. When he asked to stop, I stopped.
[[Image here]]
At that point after that when I asked the questions, he declined to say any [sic] further so we ended the interview.
Defense counsel did not offer any objections to the above testimony at trial. Then, during cross-examination of Investigator Gamer by defense counsel, the following exchange took place:
Q: When you asked him about the trailer, what did you ask him about the trailer?
A: I asked him did anything occur there.
Q: Okay.
A: And again, you know, after he made this initial statement that we have, any question that I asked pointed about any of the other locations, he simply did not want to answer, so, you know, he has the right to refuse to answer me.
Q: But when he first refused to answer, did you keep on asking him questions?
A: Only about that one. I asked him twice.
Q: Well, did you ask him questions-you said that was about the mobile home, correct?
*1085 A: Uh-huh.
Q: Did you ask him any questions about what occurred at his house?
A: No[,] because then he didn’t want to talk anymore.
¶ 30. The record shows that defense counsel offered no objection to Investigator Garner’s testimony during direct examination by the State, and Investigator Garner was responding to questions from defense counsel during cross-examination. Further, we acknowledge that our supreme court has provided guidance regarding the difference between commenting on a defendant’s failure to testify and responding to an asserted defense. In Dora v. State, 986 So.2d 917, 923 (¶ 11) (Miss.2008), the supreme court explained:
The [S]tate is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to the defendant’s failure to testify by innuendo and insinuation. The question is whether the prosecutor’s statement can be construed as commenting upon the failure of the defendant to take the stand.
(Internal quotations omitted and emphasis added). Therefore, in accordance with the supreme court’s holding in Dora, we find that this issue is without merit.
C. Fourth Amendment Rights
¶ 31. Kleckner argues that his Fourth Amendment rights were violated when he was seized from Carson’s home without a search warrant.
¶ 32. According to testimony presented at trial, the officers armed with an arrest warrant for Kleckner entered by Carson’s consent without objection from Kleckner.[11] Upon entry of the home, the officers witnessed Kleckner asleep on the couch. While Carson testified that after October 2007, Kleckner stayed at her house most of the time, nothing appears in the record showing that Kleckner refused the officer’s entry into the home. Georgia v. Randolph, 547 U.S. 108, 122-23, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (finding that although co-tenants generally have the ability to consent to search, “a physically present inhabitant’s express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.”). See also United States v. Cooke, 674 F.3d 491, 496 (5th Cir.2012). Accordingly, we find that this contention of error is without merit.
IV. SPEEDY TRIAL
¶ 33. Kleckner argues that both his statutory and constitutional speedy-trial rights were violated. The record shows that Kleckner raised no speedy-trial demand with the trial court; therefore, his statutory claim is procedurally barred. Patterson v. State, 79 So.3d 549, 549-50 (¶ 7) (Miss.Ct.App.2011).
¶ 34. The Mississippi Supreme Court has set forth the standard of review we must employ when reviewing constitutional speedy-trial claims that are raised for the first time on appeal:
*1086 Given that the constitutional right to a speedy trial is a fundamental right, see Klopfer v. State of North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), this Court must determine whether plain-error review is applicable, i.e., whether an “error of the trial court has impacted upon a fundamental right,” Sanders v. State, 678 So.2d 663, 670 (Miss.1996), and is “so fundamental that it generates a miscarriage of justice.” Morgan v. State, 793 So.2d 615, 617 ([¶ ]9) (Miss.2001). Absent the plain-error criteria being satisfied unequivocally, appellate courts are loath to address issues not presented to the trial court.
Dora, 986 So.2d at 925 (¶ 19). “The Dora court went on to note that Terry ‘Dora seeks to leapfrog over the required plain-error analysis by making Barker-genre assertions, i.e., prejudice caused by length of delay, prejudice by virtue of the amended indictment which included prior felony convictions, and prejudice due to a change in a witness’s testimony.’ ” Patterson, 79 So.3d at 550 (¶ 8) (footnote omitted).
¶ 35. Similarly, .in this case, Kleckner makes blanket assertions of prejudice rather than pointing out any instance of actual prejudice. Kleckner simply claims that he:
suffered prejudice in the form of tremendous anxiety, irreparable harm caused by abuse of “awful machinery of the criminal law,” being incarcerated now for nearly two years for offenses he vigorously maintains his innocence of, after suffering through a trial under circumstances in which no lawyer could have provided him with effective assistance of counsel.
Kleckner then contends that “one of his alibi witnesses, both of whom are aging and whom the State has been informed of, is now incompetent,” and that “the fact that had he been tried within 270 days, he would not have been hospitalized during the [three] days scheduled for critical and intensive pretrial preparation by Mr. Gay.”
¶ 36. In making his argument, Kleckner cites no case for the proposition that delays of any particular length automatically overcome the procedural bar or constitute plain error, and this Court knows of no such authority. Moreover, Kleckner failed to provide the State with notice of any alibi witnesses or the relevance of the testimony of these alleged witnesses. In Dora, three years, three months, and six days passed between Dora’s arrest and subsequent trial. Id. at (¶ 9) (citation omitted). The record shows that Kleckner was arrested on September 10, 2008; he was indicted on October 21, 2008; a capias was served and arraignment was waived on November 10, 2008; a trial-setting order was entered on June 10, 2009, which set the trial for September 14, 2009; and his trial commenced on September 16, 2009.
¶ 37. As established above, approximately one year elapsed between Kleck-ner’s initial arrest and his trial. We note that this amount of time is significantly less than the amount of time that elapsed in Dora; nonetheless, our supreme court affirmed Dora’s conviction. After reviewing the record, we find no prejudice or reason to do otherwise in this case. This issue is without merit.
V. FAIR AND IMPARTIAL JURY[12]
¶ 38. Kleckner argues that he failed to receive a trial by a fair and impartial jury, which violated his fundamental constitutional rights. Specifically, Kleckner points *1087 to Juror 43's failure to speak up during voir dire and disclose her relationships with (1) her mother, who was also the sheriff’s designee at the post-remand hearing; and (2) her spouse, an investigator with the New Albany Police Department. Kleckner also claims that a prohibited conversation occurred between another juror, Juror 61, and AB’s uncle during trial. We find no merit to Kleckner’s contentions, and we will address each allegation in turn.
¶ 39. On the “Juror Information Form,” Juror 43, Neely A. (Cousar) Robertson, listed Margaret Cousar as her mother and Chris Robertson as her spouse who is an investigator with the New Albany Police Department. During voir dire, the State asked the jury the following question:
Q: Has anyone ever had themselves or because of contact with law enforcement through a family member or close friend, whether it be good or bad, that you think we ought to know about? If you were chosen as a juror and you sat down in that box that you would come in with something going on in your mind that there’s something there, any preconceived notions or bias or prejudice one way or the other for or against law enforcement in general? Anyone got any of those problems?
(HAND RAISED)
Q: Yes, sir?
A: (By Juror Number 1, Ronald Gene Ray) Ronald Ray, Number 1. I served as a law enforcement officer in the past.
Q: How long ago has that been?
A: It’s been over 30 years ago.
Q: Over 30 years ago. Where was that at?
A: Lee County Sheriffs Department and Baldwyn Police Department and Bolivar County Sheriffs Department and Cleveland Police Department.
[[Image here]]
Q: Anything about that past association with law enforcement that would keep you from being fair and impartial in this case?
A: No, sir.
Q: Anyone else?
(HAND RAISED)
Q: Yes, ma’am?
A: (By Juror Number 3, Anita Gail Douell) Number 3, Anita Douell. My mother is a part-time dispatcher at the sheriffs department here in Union County.
Q: Your mother?
A: My mother.
Q: I know Ms. Katherine. I believe you’re related to Ms. Phyllis there?
A: Yes.
Q: The fact that your mother is a part-time dispatcher at the sheriffs department and we’re going to have the sheriffs department’s employees testify in this case, could you set that aside and be fair and impartial?
A: Yes, sir.
Q: Thank you. Anyone else?
A: (By Unidentified Juror) Are you asking if we have any relatives?
Q: That was my next question. That’s where we were headed, but right now just because of your life history, family and things like that, have you got any bias or prejudice for law enforcement or against law enforcement in general?
(NO RESPONSE)
Q: My next question is going to be this: When you get a crowd of peo- *1088 pie this size in a county the size of [Union] and ask is anybody related to law enforcement, I would probably see a number of hands. My question is going to be more specific than that. Is there anybody here that’s related to a current or former law enforcement officer by blood or marriage or any other way and that because of that association with a law enforcement officer you couldn’t be fair and impartial in this case? Because of that association I’m going to go to the police officer no matter what he says or anything like that? You couldn’t set that aside and be fair and impartial?
(NO RESPONSE)
Q: Seeing no hands, I assume as to that issue we all could be fair and impartial....
(Emphasis added). Kleckner asserts that Juror 4S’s failure to speak up during voir dire and disclose that her mother worked at the sheriffs department, the investigating agency in this case, and that the juror’s husband worked at the New Albany Police Department, denied him a fair and impartial jury.
¶ 40. In a similar situation, Buckley v. State, 772 So.2d 1059, 1063-65 (¶¶ 12-20) (Miss.2000), the Mississippi Supreme Court found that voir dire questions as to whether any potential juror or any member of a potential juror’s family was related to any police or law enforcement officer, sheriff, or “what have you,” was ambiguous as it related to a potential juror whose daughter worked as a part-time police dispatcher for the Newton Police Department. The supreme court held that the potential juror’s failure to respond did not warrant a new trial. Id. at 1064-65 (¶¶ 19-20). In this case, the pertinent question asked by the State to the jurors during voir dire was if they could be fair and impartial despite being related to a law enforcement officer. The question asked was not whether they were related to a law enforcement officer. See Mariner Health Care, Inc. v. Estate of Edwards, 964 So.2d 1138, 1147-48 (¶ 19) (Miss.2007) (“There is no unbending rule for every situation that might arise on the voir dire of prospective jurors. Rather, each case must be decided based on the facts presented. Additionally, we must consider the relationship between the question posed and the juror’s knowledge.”) (internal citations omitted). Accordingly, this issue is without merit.[13]
¶ 41. As to Kleckner’s argument that a prohibited conversation between a juror and AB’s uncle occurred, violating his right to a fair and an impartial jury, we also find no merit. In making this argument, Kleckner asks for a change in the present state of the law, citing to Greer v. State, 755 So.2d 511 (Miss.Ct.App.1999), urging this Court to consider adopting a per se disqualification of any juror violating the express terms of Rule 3.06 of the Uniform Rules of Circuit and County Court, as Juror 61 allegedly did in this case. This Court in Greer provided that “[w]henever there is a question concerning outside influencing of a jury, the trial judge himself ought to examine the jury carefully to ensure that the jury’s deliberations are based on the evidence produced *1089 at trial and not extraneous matters.” Greer, 755 So.2d at 515 (¶ 10) (citation omitted). In this case, the trial court permitted counsel to conduct, and in fact conducted its own, examination of the parties involved. Both the jury member and AB’s uncle testified that they did not communicate about the case; rather, their exchange involved directions to locations within the courthouse. The trial court even asked Gay, Kleckner’s trial counsel, if he wanted to make an exception, to which Gay declined. Therefore, in accordance with Mississippi precedent, which we decline to overrule, we find no merit to this assignment of error. See id. at 515 (¶ 11) (“The mere possibility that the jurors may have been influenced by some extraneous matter is not enough to set aside a verdict.”).
VI. SENTENCES[14]
¶ 42. Kleckner argues that his three life sentences, without possibility of parole, plus his consecutive, fifteen year sentence violates his Eighth Amendment constitutional rights and/or his Article 3, Section 28 rights of the Mississippi Constitution. Kleckner also argues that the trial court erred by sentencing him without holding a sentencing hearing in violation of his due-process rights. We find no merit to these allegations.
¶ 43. The Mississippi Supreme Court has held:
As a general rule, when sentences are within the limits of the statute, the imposition of such sentences is within the sound discretion of the trial court[,] and this Court will not reverse them. Likewise, we have held that providing punishment for crime is a function of the legislature, and, unless the punishment specified by statute constitutes cruel and unusual treatment, it will not be disturbed by the judiciary. Presley v. State, 474 So.2d 612, 620 (Miss.1985). We review sentences in light of the factors articulated by the United States Supreme Court in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), only when a threshold comparison of the crime committed to the sentence imposed leads to an inference of “gross disproportionality.” Nichols v. State, 826 So.2d 1288, 1290 (Miss.2002). Generally, sentences that do not exceed the maximum term allowed by statute will not be considered grossly disproportionate and will not be disturbed on appeal. Fleming v. State, 604 So.2d 280, 302-03 (Miss.1992).
Johnson v. State, 950 So.2d 178, 183 (¶¶ 22-23) (Miss.2007) (citation omitted).
¶ 44. The relevant sentencing statutes are Mississippi Code Annotated section 97-3-101(3) (Rev. 2006) and section 97-5-23(1). Section 97-3-101(3) provides:
Every person who shall be convicted of sexual battery under Section 97-3-95(l)(d) who is eighteen (18) years of age or older shall be imprisoned for life in the State Penitentiary or such lesser term of imprisonment as the court may determine, but not less than twenty (20) years.
Section 97-5-23(1) states as follows:
Any person above the age of eighteen (18) years, who, for the purpose of gratifying his or her lust, or indulging his or her depraved licentious sexual desires, shall handle, touch or rub with hands or any part of his or her body or any member thereof, any child under the age of sixteen (16) years, with or without the child’s consent, or a mentally defective, *1090 mentally incapacitated or physically helpless person as defined in Section 97-3-97, shall be guilty of a felony and, upon conviction thereof, shall be fined in a sum not less than One Thousand Dollars ($1,000.00) nor more than Five Thousand Dollars ($5,000.00), or be committed to the custody of the State Department of Corrections not less than two (2) years nor more than fifteen (15) years, or be punished by both such fine and imprisonment, at the discretion of the court.
¶ 45. Kleckner was convicted of three counts of sexual battery under section 97-3 — 95(l)(d) and one count of touching a child for lustful purposes under section 97-5-23. The trial court sentenced Kleckner to three concurrent life sentences for the sexual-battery charges and to a consecutive sentence of fifteen years for the charge of touching a child for lustful purposes. “The sentenced] imposed by the trial court [were] within the statutory limitation and ... within the sound discretion of the learned trial judge.” Johnson, 950 So.2d at 183 (¶ 25). Accordingly, we find that this issue is without merit.
¶ 46. Kleckner next argues that the trial court’s sentencing him to the maximum sentences on all four counts, including three life sentences without the possibility of parole, without a sentencing hearing violated his due-process rights. In support of his argument, Kleckner cites to Rule 10.04(B) of the Uniform Rules of Circuit and County Court.[15] We, however, find Rule 10.04(B) inapplicable to the case at hand. Rule 10.04(B) pertains to cases where the jury sentences the defendant. In this case, the trial court sentenced Kleckner to life in the custody of the MDOC in accordance with section 97-3-101(3). As stated, section 97-3-101(3) provides, “Every person who shall be convicted of sexual battery under [s]ection 97-3-95(l)(d) who is eighteen (18) years of age or older shall be imprisoned for life in the State Penitentiary or such lesser term of imprisonment as the court may determine, but not less than twenty (20) years.” Rule 10.04(C) of the Uniform Rules of Circuit and County Court states as follows: “Upon conviction, or after a plea of guilty, in cases where the court has sentencing authority, there may be a hearing before the trial judge[.]” The trial court acted as statutorily permitted. Furthermore, as discussed above, the sentence did not exceed the statutory máximums; therefore, we find no error.
VII. CLOSING ARGUMENT
¶ 47. Kleckner argues that the prosecution’s closing argument, referring to Kleckner’s invocation of his right to remain silent, appealing to localism, and inflaming the jury’s passions violated his rights under the Fifth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution, his due-process rights to a fair trial, and his fundamental right to an impartial jury. Because timely objections were not made at trial, Kleckner relies on the plain-error doctrine. Specifically, Kleckner takes issue with the following statements by the prosecutor:
Twelve of y’all are going to be back there in that room deliberating this case. You’re going to be back there together. I want you to start your decision making, but I don’t want you back there together. I want y’all to be at a different place. I want each and every one of you to be on a curvy county road at 12-years [old] getting to drive a car for the *1091 first time. If you’re like me and you can’t remember back that far and you’ve got kids, you might remember it through your kids. I’ve got a 13-year-old boy and I live about a half mile down Ingomar [RJoad, and a year or so ago when he was 12, he started talking me into sometimes stopping at J & J Grocery and let [sic] him drive from J & J Grocery a half mile doum Ingomar [RJoad just like this. When we would get home, he would say, How fast did I get up to, Daddy? I said, You was driving.[sic] You look. You tell me. I couldn’t look at the speedometer. I was driving.
[[Image here]]
That personally insults my intelligence, and I hope it does yours.
[[Image here]]
... now I don’t know how he was raised and I don’t know what they do in Aurora, Illinois, but he comes into [sic] the deputy and says, There are two sides to every story and I’m going to tell you my side of the story.
[[Image here]]
When it got to that point where Roger Garner is not buying this, Ooh, I better be quiet, but you’ve got a man with a college education, and you will have this statement back there and you will count nine separate instances and there’s no dispute about how the statement was taken.
[[Image here]]
You heard Angie Floyd say, yeah, it’s very seldom that we have a disclosure where somebody is a victim of somebody they love and comes in and tells on an adult because they love that person. If it’s a stranger on the street and they somehow get in contact, they will run and go tell somebody, but they’re not going to tell somebody when it’s somebody they love. You saw how it affected her three years after the fact. We can come back in three more years and it will still be with her. We can come back in 30 years and it will still be with her. If she comes back here as a 90-year-old woman and has to take that stand, it will still be there. It will still be tearing her up because here is a man that she’s loved like an uncle, a neighbor, known her all her life, carried her places.
¶ 48. Because Kleckner’s attorney did not raise a contemporaneous objection at trial, this issue is procedurally barred from appellate review unless it constitutes plain error. See Morris v. State, 963 So.2d 1170, 1178 (¶ 27) (Miss.Ct.App.2007). As noted at the outset of our discussion, only an error that affects the defendant’s substantial rights rises to the level of plain error. Taylor, 754 So.2d at 603 (¶ 11). “To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.” Cox v. State, 793 So.2d 591, 597 (¶ 22) (Miss.2001) (citations omitted).
¶ 49. In reviewing claims of a prosecutor’s misconduct in closing argument, this Court has provided the following standard:
The standard used in reviewing closing arguments is “whether the natural and probable effect of the prosecuting attorney’s improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice.” Rushing v. State, 711 So.2d 450, 455 (¶ 15) (Miss.1998) (quoting Taylor v. State, 672 So.2d 1246, 1270 (Miss.1996)). In reviewing whether a prosecutor’s closing remarks constitute reversible error, we are to employ a two-part test. Spicer v. State, 921 So.2d 292, 318 (¶ 55) (Miss.2006). First, we review the remarks and determine whether the remarks were improper. Id. If we find *1092 that the prosecutor’s statements during summation were improper, then we analyze whether the remarks prejudicially affected the accused’s rights. Id. “It must be clear beyond a reasonable doubt, that absent the prosecutor’s comments, the jury could have found the defendant guilty.” Id.
Moss v. State, 977 So.2d 1201, 1211 (¶ 20) (Miss.Ct.App.2007). “Attorneys are allowed wide latitude in arguing their cases to the jury, but they are not allowed to employ tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury.” Shumpert v. State, 935 So.2d 962, 972 (¶ 38) (Miss.2006).
¶ 50. We are unable to find that the prosecutor’s statements were improper. More importantly, in keeping in mind the strength of the evidence against Kleckner, we are unable to find that the natural and probable effect of the prosecutor’s statements was to create such prejudice against Kleckner as to result in a decision influenced by the prejudice so created. See id. In other words, the record does not evidence that, absent the State’s comments, the jury would have found Kleckner not guilty of the crimes for which he was convicted. See Bailey v. State, 952 So.2d 225, 232 (¶¶ 10-11) (Miss.Ct.App.2006). Because we find no plain error present, this issue is without merit.
VIII. ADMISSION OF EVIDENCE [16]
¶ 51. Kleckner argues that the trial court erred by permitting a “forensic” interviewing “expert” to testify when AB had already testified, and alternatively, the trial court erred by failing to give a limiting instruction on the weight to be accorded the “expert’s” testimony.[17] Additionally, Kleckner argues that the admission of justice court affidavits, the arresting officer’s report, and arrest warrants as substantive evidence, without a limiting instruction, violated his rights under the Fifth and Fourteenth Amendments and his rights under Article 3, Sections 14 and 26 of the Mississippi Constitution.[18]
¶ 52. Several factors undermine Kleekner’s claim of reversible error in this case. First, the testimony and evidence in question was not objected to by Kleckner at trial. In general, issues that were not raised at trial are barred from our consideration on appeal. Gunn v. State, 56 So.3d 568, 572 (¶ 17) (Miss.2011). However, Kleckner will still be entitled to relief if he can show that any of his complaints rise to the level of plain error. Blanchard v. State, 55 So.3d 1074, 1077 (¶ 16) (Miss.2011). “Plain error exists where such error affects the defendant’s substantive/fundamental rights, even though no objection was made at trial.” Parker v. State, 30 So.3d 1222, 1227 (¶ 14) (Miss.2010). After reviewing the record, we find that Kleck-ner’s assertions of error as stated above fail to rise to the level of plain error. See Ross v. State, 954 So.2d 968, 995 (¶ 51) (Miss.2007) (“[T]he admission of evidence is within the discretion of the trial court, and courts have been instructed to con *1093 strue the Mississippi Rules of Evidence in favor of admission.”).
¶ 53. These contentions of error are without merit.
IX. LEGAL SUFFICIENCY
¶ 54. Kleckner argues that if the inadmissible evidence had been excluded, there would not be sufficient evidence to support any of his convictions. When reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to the State to determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). The evidence presented at trial included the testimony of AB as to the sexual misconduct of Kleckner; witness testimony that AB was twelve-years old and Kleck-ner was over the age of eighteen[19] at the time of the sexual misconduct; the testimony of Floyd, the forensic interviewer and expert witness; and Kleckner’s confession. We find reasonable, fair-minded jurors could find beyond a reasonable doubt that Kleckner was guilty of the crimes of sexual battery and the touching of a child for lustful purposes. This issue is without merit.
X. INEFFECTIVE ASSISTANCE OF COUNSEL [20]
A. Application of Strickland
¶ 55. With new appellate counsel, Kleckner argues that his trial counsel rendered ineffective assistance in violation of his constitutional rights. Specifically, Kleckner contends that he was denied counsel at a critical stage in the proceedings and that his trial counsel did not subject the prosecution’s case to meaningful adversarial testing. He bases his claim on his attorney’s alleged failure to: (1) effectively cross-examine AB, the arresting officer, and the “forensic” interviewing expert; (2) object to the State’s continual leading questions and repetitive summari-zation of AB’s testimony; (3) object and move to strike the medical opinion testimony of the arresting officer; (4) file a motion to suppress Kleckner’s officer-written confession; (5) file a proper motion for a continuance, to make a record of the in-chambers hearing, to object on the record when trial commenced, and to bring to the court’s attention the observed and marked change in Kleckner’s behavior at trial; (6) identify the “juror insider” and strike her, or to at least make an exception to preserve error as to the tainted juror; (7) object to the State’s introduction of the arrest warrants and a justice court affidavit into evidence, all rank hearsay; (8) file a motion to quash the multi-count indictment; (9) file anything more than a pro forma motion for a JNOV or, in the alternative, a new trial; and (10) request a sentencing hearing. Kleckner also argues that his counsel rendered ineffective assistance by introducing testimonial documents at trial, including justice court affidavits, the officer’s report, and the Family Resource Center report.
¶ 56. The Mississippi Supreme Court has adopted the standard as set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to analyze a claim of ineffective assistance of counsel. Johnson v. State, 29 So.3d 738, 745 (¶ 20) (Miss.2009). In order to prevail under Strickland, Kleckner must show that (1) his counsel rendered a deficient performance, and that (2) the deficiency prejudiced his defense. Id. The *1094 burden of proof rests with Kleckner to show both prongs. Jackson v. State, 73 So.3d 1176, 1181 (¶ 19) (Miss.Ct.App.2011). A strong but rebuttable presumption exists that his counsel’s decisions were sound trial strategy. Johnson, 29 So.3d at 745 (¶ 20). The United States Supreme Court has found that “a court must indulge a ‘strong presumption’ that counsel’s conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.” Id. (quoting Bell v. Cone, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002)). “To overcome that presumption, [Kleckner] must show that, but for his counsel’s deficiency, a different result would have occurred. Id.
¶ 57. Furthermore, the merits of a claim of ineffective assistance of counsel brought on direct appeal should be addressed only when “(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.” Jackson, 73 So.3d at 1181 (¶ 20). The supreme court has held:
The question presented is not whether trial counsel was or was not ineffective but whether the trial judge, as a matter of law, had a duty to declare a mistrial or to order a new trial, sua sponte on the basis of trial counsel’s performance. “Inadequacy of counsel” refers to representation that is so lacking in competence that the trial judge has the duty to correct it so as to prevent a mockery of justice.
Id. “If this Court does not reverse on other grounds and is unable to conclude that the defendant received ineffective assistance of counsel, it should affirm ‘without prejudice to the defendant’s right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings.’ ” Id. “Review on direct appeal of an ineffective-assistance-of-counsel claim is confined strictly to the record.” Id.
¶ 58. As set forth above, Kleck-ner asserts several alleged instances of deficient representation. Kleckner, however, faces a great burden to prove that such deficiencies amounted to ineffective assistance of counsel. Further, our review of the record reveals that we have no reason to second guess counsel’s trial strategy.
¶ 59. As this Court held in Hancock v. State, 964 So.2d 1167, 1175 (¶ 18) (Miss.Ct.App.2007):
[A] strong presumption exists “that the attorney’s conduct fell within the wide range of reasonable professional assistance.” Carr v. State, 873 So.2d 991 (¶ 27) (Miss.2004). “[Counsel’s choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy” and will not stand as support for an ineffective assistance of counsel claim. Id. (citing Cole v. State, 666 So.2d 767, 777 (Miss.1995)).
See also Jackson, 73 So.3d at 1181-82 (¶ 22).
¶ 60. After reviewing the record, we find no obvious deficiencies that rose to the level of ineffective assistance of counsel. We further find no merit to Kleck-ner’s claim that he was denied counsel at a critical stage in the proceedings. The record shows that Gay had ample opportunity to prepare for trial and was not denied access to his client. As previously discussed, Gay testified at the post-remand *1095 hearing that he entered his appearance in this case in April 2009 and that he had “prepared some months in advance because it was preset one time.” Gay further testified to meeting with Kleckner to prepare him for trial for approximately two-and-one-half hours on September 9, 2009, several days prior to trial which was set for September 14, 2009.
¶ 61. Based on the foregoing, we deny relief on this issue without prejudice so that Kleckner may, if he desires to do so, present an ineffective-assistanee-of-counsel claim in a motion for post-conviction collateral relief.
B. Application of Cronic
¶ 62. Alleging many of the same errors, Kleckner cites United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), for the propositions that his counsel was absent during a critical stage of trial, i.e., pre-trial preparation; that his counsel failed to subject the prosecution’s ease to meaningful adversarial testing; and that his counsel was called upon to render assistance under circumstances where the possibility of any lawyer, even a fully competent one, providing effective assistance was small. The Supreme Court in Cronic, found that “there are circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.” Johnson, 29 So.3d at 748 (¶ 34) (quoting Cronic, 466 U.S. at 658, 104 S.Ct. 2039). The Court in Cronic provided three instances in which prejudice was presumed: “(1) when counsel is completely denied; (2) when counsel entirely fails to subject the prosecution’s case to meaningful adversarial testing; (3) and when counsel is called upon to render assistance under circumstances where competent counsel very likely could not.” Id. (citing Cronic, 466 U.S. at 659-60, 104 S.Ct. 2039). Further, the Supreme Court has held that a proper analysis falls under Strickland, not Cronic, when “respondent’s argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points.” Id. (quoting Bell, 535 U.S. at 697, 122 S.Ct. 1843). “For purposes of distinguishing between the rule of Strickland and that of Cronic, this difference is not of degree but of kind.” Id.
¶ 63. After reviewing the record, we find that the present case is properly analyzed under Strickland, since Kleckner argues specific failures of his counsel, not failure as a whole. We also find, for the reasons previously set forth, that Kleckner was not denied counsel during a critical stage of trial. Accordingly, we find Kleck-ner’s argument under Cronic to be without merit.
XI. CUMULATIVE ERROR
¶ 64. In his conclusion, Kleckner argues that if this Court finds no reversible error was committed, then the Court should find that his assignments of error reveal, at the very minimum, harmless error. Kleckner asserts that the number of harmless errors committed by the trial court should have a sufficient cumulative effect to result in prejudice to his defense requiring a new trial or vacation of his sentence. “However, where ‘there [is] no reversible error in any part ... there is no reversible error to the whole.’ ” Johnson v. State, 760 So.2d 33, 38 (¶ 17) (Miss.Ct.App.2000) (quoting McFee v. State, 511 So.2d 130, 136 (Miss.1987)). Because we find no merit in any of Kleckner’s assignments of error, we will not reverse his conviction based upon cumulative error.
¶ 65. THE JUDGMENT OF THE UNION COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, TOUCHING A CHILD FOR LUSTFUL PURPOSES, AND SENTENCE OF FIF *1096 TEEN YEARS; COUNTS II, III, AND IV, SEXUAL BATTERY, AND SENTENCE OF LIFE ON EACH COUNT, WITH THE THREE LIFE SENTENCES TO RUN CONCURRENTLY AND THE SENTENCE OF FIFTEEN YEARS TO RUN CONSECUTIVELY TO THE THREE, CONCURRENT LIFE SENTENCES, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE AND FAIR, JJ„ CONCUR. BARNES, MAXWELL AND RUSSELL, JJ., CONCUR IN PART AND IN THE RESULT. ROBERTS, J., NOT PARTICIPATING.

. This Court protects the identity of victims of sexual abuse who are minors.

. This Court denied Kleckner's request for oral argument on the petition and also dismissed without prejudice Kleckner’s motion to reverse and remand for a new trial and/or sentencing, finding that the motion was to be considered during the appeal to this Court.

. In this motion, Kleckner claimed that an assistant district attorney formerly involved with his case had acted improperly. Kleck-ner’s motion also stated that documents from the Union County Sheriff’s Department were withheld from Gay prior to trial, which demonstrated the sheriff's knowledge of Kleck-ner’s medical conditions on the day of the officer-written confession. Kleckner further informed the trial court of his receipt of statements from national, regional, and local experts in endocrinology as to the effects of his medical condition on his vision and comprehension.

. For purposes of efficiency, we have combined Issues III and VI.

. Kleckner contends that Gay had a plan-to meet with him on the Wednesday before trial and then meet with him again on the Friday, Saturday, and Sunday before trial for intense pre-trial preparation.

. Kleckner alleges that on the day the trial was to commence, Honey Usseiy, an assistant district attorney formerly associated with the case, went to the hospital where Kleckner was being treated to intimidate his medical providers. Kleckner asserts that his fiancé, Linda Carson, witnessed Ussery engaging in an angiy conversation with a nurse at the hospital. Kleckner claims that he was subsequently discharged from the hospital after the ADA’s "show of force.” Usseiy, at the post-remand hearing, denied these allegations. Usseiy testified that because there was a jury seated, she along with her investigator went to the hospital to verify that Kleckner was in fact there and to find out if he would be released. Ussery testified that she went to the door of Kleckner’s room and spoke with Carson to find out when Kleckner would be released. Usseiy testified that she did not speak with Kleckner or acknowledge him in any way. According to Usseiy, upon leaving the hospital, she asked a doctor in the hallway when Kleckner would be released, to which the doctor responded that he had no information. Ussery testified that she thanked him and left the hospital. Ussery denied having a conversation with the nurse while at the hospital as alleged by Kleckner.

. For purposes of efficiency, we have consolidated Issues V and XIII.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Presumably, Kleckner is referring to his medications that he takes to control his diabetes.

. We have combined Issues VII and X for efficiency purposes.

. Aldridge testified that upon reaching the trailer, the officers went to the door at the residence, knocked on the door, and were met at the door. Aldridge further testified that upon entering the trailer, he saw Kleckner asleep on the couch. According to Aldridge, only Kleckner and another lady were present in the trailer. Investigator Garner and Kleck-ner both testified that Kleckner and his fian-cé, Carson, were the only two people present at the trailer upon the officers’ arrival at Carson’s trailer. Contrary to Aldridge’s testimony, Kleckner testified that the officers knocked on the door and then "barged” into the house.

. We have consolidated and addressed Issues XI and XII in this section of our discussion.

. During the post-remand hearing, a Margaret Cousar, acting as the sheriffs designee, responded to a subpoena duces tecum and testified to documents kept at the Union County jail. While Kleckner complains Juror 43 failed to reveal her relationship with Cou-sar, there is no evidence in the record that Juror 43's mother is the same "Margaret Cou-sar” who testified at the post-remand hearing. However, even if they were the same person, Kleckner was not denied a fair and impartial jury for the reasons stated above.

. We have combined Kleckner’s Issues XVI and XVII in our discussion of this assignment of error.

. See Lewis v. State, 765 So.2d 493, 505 (¶ 48) (Miss.2000) (holding that Rule 10.04(B) "requires a sentencing hearing only where a life imprisonment sentence is optional”).

. For purposes of efficiency, we have combined Issues IX and XV.

. Kleckner contends that Gay neither objected at trial to the expert’s testimony nor requested a jury instruction to ensure that the jury did not give undue weight to the "expert's” opinions.

. Kleckner asserts that no objection was made to the evidence, nor was a limiting instruction sought when these documents were introduced. Kleckner alleges that although Gay did later seek a jury instruction as to the limited use of the documents, the instruction was denied.

. Investigator Gamer testified that Kleck-ner's date of birth is December 9, 1961.

. For purposes of concision, we have combined Issues I and II.