NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3944-16T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

TEOSHIE WILLIAMS,

      Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

August 29, 2019

APPELLATE DIVISION

Argued October 29, 2018 – Decided August 29, 2019

Before Judges Messano, Gooden Brown, and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-09-0992.

Molly O'Donnell Meng, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Molly O'Donnell Meng, of counsel and on the briefs).

Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jenny M. Hsu, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following the denial of her motion to suppress evidence seized from her apartment without a search warrant, defendant Teoshie Williams entered a negotiated guilty plea to third-degree hindering apprehension, N.J.S.A. 2C:29-3(a)(1), and was sentenced to fines only. Under the terms of the plea agreement, the remaining eight counts charged in a forty-six count indictment,[1] consisting of three counts of drug possession-related charges, four counts of child endangerment, and one count of hindering apprehension, were dismissed.

The sole issue before us in this appeal is whether police lawfully entered and searched defendant's apartment. More particularly, defendant argues:

> THE INITIAL ENTRY INTO THE APARTMENT, THE PROTECTIVE SWEEP, AND THE SUBSEQUENT SEARCH WERE UNCONSTITUTIONAL. THEREFORE, THE COCAINE SEIZED MUST BE SUPPRESSED AS THE FRUIT OF THOSE UNLAWFUL SEARCHES.

We reject these contentions and affirm.

## I.

At the suppression hearing, six police witnesses testified, namely, New Brunswick Police Officers Miguel Chang, John Yurkovic, William Contreras, and Edward Bobadilla, as well as Detective Brandon Epstein and Sergeant

---

[1] Co-defendants Shavonda Stokes, Musset Celestin, Jr., Shakil Brinson, Ivery Brinson, and Lurine Brinson were also charged in various counts of the indictment. Although they each filed a suppression motion, they are not part of this appeal.

Michael Yurkovic.[2] Lurine Brinson testified for the defense. The motion record revealed that at approximately 6:30 p.m. on July 9, 2013, Chang responded to a call from Commercial Avenue in New Brunswick and spoke to the caller, Shanae Alston. Alston advised Chang that she had obtained custody of her niece, A.W., a minor, who was inside a third-floor apartment with her (A.W.'s) mother, Lurine Brinson. After showing Chang a copy of the court order, Alston explained that Lurine Brinson was "wanted for questioning" because her two brothers, Shakil and Ivery Brinson, were suspects in a homicide in Irvington. Alston sought police assistance in obtaining custody of A.W., and believed that Shakil and Ivery Brinson were both "most likely" inside the apartment, along with Lurine Brinson and A.W.

Although Chang was accustomed to handling custody disputes, given the information about homicide suspects, he called his supervisor, Sergeant M. Yurkovic (the Sergeant), and "asked him to come . . . to the scene" because he was concerned about officer safety. The Sergeant promptly responded, along with Contreras, Bobadilla, and J. Yurkovic (Yurkovic). Once they arrived, Chang relayed the information Alston had provided and the Sergeant read the child custody order. The Sergeant contacted a supervisor in the Irvington

---

[2] The State presented the testimony of Chang, Epstein, and John Yurkovic. The remaining police witnesses were presented by the defense.

Police Department as well as his own dispatch and confirmed that Shakil and Ivery Brinson had active warrants for a murder charge involving the use of a firearm. Upon receiving the confirmation, the officers proceeded to the apartment identified by Alston.

As they approached the third-floor apartment, Yurkovic had "a long arm"[3] slung over his shoulder, while the other officers' guns were holstered. Upon arrival, Chang knocked on the door several times and announced "police." Although the officers heard "movement inside" and "people talking," they waited approximately "two to three minutes" before someone eventually opened the door. The delay in opening the door and the sounds emanating from inside the apartment "heightened" Yurkovic's "suspicions" that the two suspects were "possibly" in the apartment.

An individual later identified as Shavonda Stokes opened the door.[4] Mistaking Stokes for a minor, Chang asked whether her "mom [was] home." At that point, an individual later identified as defendant came to the door. Chang advised defendant that police were there "for a custody issue," and

---

[3] Yurkovic testified he was carrying the "long arm" or rifle "at a low ready position[,]" which "would be the equivalent to carrying [a] pistol in [a] holster."

[4] The Sergeant testified after the door was opened, "[t]here was a smell of burnt marijuana" emanating from the apartment.

A-3944-16T2

asked if they could "come in[.]" Defendant responded, "[s]ure," and allowed the officers to enter the apartment. Once inside, the officers observed four minors and three female adults in the living room area. Chang then informed defendant that they were called "for a custody issue concerning [A.W.]," but also received "information" that there were possibly "two homicide fugitives inside the apartment[.]" Defendant advised the officers that "they[] [were] not here." After defendant confirmed she was the lawful resident of the apartment, Chang asked defendant if they could conduct a "protective sweep," to which defendant responded, "[s]ure, go ahead."

After defendant consented, Chang "went straight down the hallway[,]" "quickly checked the bathroom . . . on the right side of the hallway," and then proceeded to a small "bedroom . . . at the end of the hallway." Inside the bedroom, he observed "feet hanging out between . . . two air mattresses." He "flipped over the top air mattress" and found an individual later identified as Shakil Brinson "hiding between the air mattresses." Chang placed Shakil Brinson in handcuffs, "[led] him down the hallway," and "pass[ed] him off to the other officers." Meanwhile, Yurkovic also went "down the hallway" to the master bedroom on "the left." Inside the master bedroom, Yurkovic found an individual later identified as Musset Celestin, Jr. seated on the bed, and escorted him to the living room with the other officers. Upon resuming the

A-3944-16T2

sweep, Yurkovic "check[ed] the [hallway] closet," and found another individual, later identified as Ivery Brinson, "hiding under a pile of clothing." Yurkovic promptly placed him in handcuffs and led him to the living room. According to Chang and Yurkovic, the sweep lasted "[a]pproximately one to two minutes" and was confined to areas where "a person could hide." They testified no "drawers" or "cabinets" were "open[ed]" during the sweep.

Thereafter, while awaiting further instructions, the officers secured the scene by ensuring that nobody entered the apartment. The Brinson brothers were separated from the other occupants and placed under arrest. Upon learning that an investigator from the Essex County Prosecutor's Office (ECPO) wanted to search the apartment for evidence related to the Irvington homicide, the officers remained at the scene. Later, Detective Brandon Epstein, who was trained in consensual searches, responded to "assist" with the search of the apartment. At approximately 9:00 p.m., accompanied by an ECPO detective, Epstein requested defendant's consent to search the apartment by reading defendant the consent to search form. Initially, defendant "had a question" and was permitted to "consult[] with another male [who] was" at the scene. Thereafter, defendant told the detectives that "she needed to make a phone call to her [l]awyer," which she was also permitted to do.

6

When defendant returned, Epstein again read the consent to search form to defendant and requested her consent. Defendant then consented to the search and signed the consent to search form, indicating on the form that she was not waiving her right to be present during the search. The entire process of securing defendant's consent to search, which lasted approximately fifteen minutes, was recorded on a mobile video recorder (MVR). The videotaped recording was played during the hearing. After obtaining defendant's consent, Yurkovic and Contreras performed a search of the apartment in defendant's presence. In the master bedroom, Yurkovic recovered "a large bag of cocaine under the mattress." As a result, defendant was arrested and charged, along with the three other adult occupants, Celestin, Stokes, and Lurine Brinson.

The defense version of what transpired during the police encounter conflicted with the State's. According to Lurine Brinson, Stokes opened the door as soon as she heard the knock and had "a gun [pointed] in her face" by Yurkovic. Defendant immediately "jumped up" and went to the door, at which point the officers went around her, and, with guns drawn, "started searching the [apartment]." Lurine testified the officers did not advise defendant that she did not have to consent or permit a protective sweep. Further, according to Lurine, none of the officers asked her for her name or who her child was until much later.

Following the hearing, the judge denied the motion. In a written decision issued on November 3, 2014,[5] the judge found the officers' testimony credible and made detailed factual findings consistent with their version. Next, the judge recounted at length the governing principles and applicable case law. Applying State v. Gamble, 218 N.J. 412 (2014), the judge rejected the defense contention that Alston's information was comparable to an uncorroborated anonymous tip that did not provide the requisite reasonable suspicion to justify the subsequent protective sweep. The judge explained:

> [T]he [p]olice were able to verify all the information that . . . Alston told them. Testimony reveals that . . . Alston was a person who appeared to be worthy of belief. She had not only requested assistance with a child custody order, but enhanced her credibility by actually producing a copy of that order. She also told police that Ivery and Shakil Brinson had a murder warrant out for their arrest – information that was confirmed by Sergeant Yurkovic and verified with dispatch and with the Irvington Police Department. She was not merely an "unverified" person making a claim. She was a person[,] who in a short period of time, had provided two pieces of information that were verified as true by outside sources.

Thus, considering the "verified information," the judge concluded that "the police . . . had credible evidence giving rise to a reasonable articulable suspicion that the area to be swept harbored individuals posing a danger."

---

[5] The judge also read her decision into the record on the same date.

Further, "considering all the facts leading up to the search," the judge determined that the police had "a legitimate purpose to be present at the scene and subsequently perform a cursory search of the premises upon entry, with or without consent." Additionally, the judge found that the protective sweep complied with Davila's[6] requirements that "the sweep" be "cursory and limited in scope to locations in which an individual could be concealed."

In that regard, the judge described the defense argument "that the search was a pretext to search without a warrant" as "unsubstantiated and without merit." On the contrary, the judge found "no indication that the police exceeded the permissible scope of a protective sweep" because the "[o]fficers moved through the two[-]bedroom apartment relatively quickly and only looked in places where individuals could be concealed." In fact, according to the judge, "[a]ll the individuals were found . . . in areas . . . conducive to hiding." Thus, the judge concluded that "based upon the totality of all the circumstance[s] existing at the time," "all requirements to conduct a [p]rotective [s]weep" were "adhered to without deviation" and "the search" was therefore "valid."

Turning to the consent search of the apartment, the judge rejected defendant's assertion that she "did not consent to the full search of her

_____

[6] State v. Davila, 203 N.J. 97 (2010).

apartment freely and voluntar[il]y." The judge noted that "[t]he entire encounter" between defendant and the police "regarding her consent was recorded on a police [MVR,]" which the judge viewed. The judge recounted that "[p]olice explain[ed] to [defendant] her rights," and "allowed [her] to speak to an individual at the scene and . . . make a phone call that [defendant] said was to her lawyer[,]" before defendant "executed the [c]onsent to [s]earch form."

The judge determined that defendant "was aware of her right to refuse to sign the [c]onsent form," and found, "as an aside," that defendant "questioned the officer" about her right to "be present during the search and was told that she could." The judge concluded that defendant "voluntarily waived her right to refuse to consent and granted police consent to search her apartment in accordance with the law." As a result, the police conducted, in defendant's presence, "a more extensive and intrusive search of the apartment[,]" which revealed a large quantity of cocaine. According to the judge, because "the [c]onsent to [s]earch was obtained legally," "the fruits of that search w[ould] not be suppressed." The judge entered a memorializing order and this appeal followed.

10

On appeal, defendant argues that, contrary to the judge's ruling, "every stage of th[e] search was unconstitutional[.]" Specifically, defendant asserts "[p]olice unlawfully entered the apartment without informing [defendant] that she had the right to refuse their entry[7] or the sweep;" and "unlawfully conducted a protective sweep without any reasonable, articulable suspicion that the apartment harbored an individual posing a danger[.]" Defendant continues that her "consent to search was tainted by the prior unlawful entry, sweep, and seizure of the apartment." Therefore, according to defendant, "the evidence seized must be suppressed as fruit of the unlawful searches and seizures." We disagree.

Our review of the trial court's decision on a motion to suppress is limited. State v. Robinson, 200 N.J. 1, 15 (2009). "An appellate court

---

[7] The State asserts that defendant failed to challenge the validity of defendant's consent to enter the apartment at the suppression hearing, and, as a result, has not preserved the issue for appellate review. According to defendant, in its supporting briefs, the State, in fact, presented arguments to the judge specifically asserting that police were not required "to inform the resident that he or she ha[d] the right to refuse" when only requesting "to enter a residence." When the parties fail to "make known their positions at the suppression hearing so that the trial court can rule on the issues before it[,]" or a "record is barren of facts that would shed light on [the] issue[,]" appellate courts should "decline[] to entertain [a] belatedly raised issue." State v. Witt, 223 N.J. 409, 418-19 (2015). However, such is not the case here. See State v. Scott, 229 N.J. 469, 480 (2017) (deciding to consider the argument because the existing factual record is sufficient to rule on the legal issue).

reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Boone, 232 N.J. 417, 425-26 (2017) (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Gamble, 218 N.J. at 424-25 (alteration in original) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "The governing principle, then, is that '[a] trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction.'" Robinson, 200 N.J. at 15 (alteration in original) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). "We owe no deference, however, to conclusions of law made by trial courts in deciding suppression motions, which we instead review de novo." State v. Brown, 456 N.J. Super. 352, 358-59 (App. Div. 2018) (citing State v. Watts, 223 N.J. 503, 516 (2015)).

Applying that de novo standard of review, "[w]e review this appeal in accordance with familiar principles of constitutional law." State v. Robinson, 228 N.J. 529, 543 (2017). "Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against

12                                                                    A-3944-16T2

unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012). Searches and seizures conducted without a warrant, "particularly in a home, are presumptively unreasonable" and "must be subjected to particularly careful scrutiny." State v. Edmonds, 211 N.J. 117, 129 (2012) (quoting State v. Bolte, 115 N.J. 579, 583, 585 (1989)). As such, "[t]he State bears the burden of proving by a preponderance of the evidence," id. at 128, that such searches and seizures are "justified by one of the '"well-delineated exceptions" to the warrant requirement.'" State v. Shaw, 213 N.J. 398, 409 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004), overruled in part by State v. Edmonds, 211 N.J. 117 (2012)).

The exceptions invoked in this case to justify the warrantless search of defendant's apartment are a protective sweep and a consent search. "[A] 'protective sweep' is a quick and limited search of premises, incident to an arrest[,] and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Davila, 203 N.J. at 113 (quoting Maryland v. Buie, 494 U.S. 325, 327 (1990)). In Robinson, our Supreme Court

> limited the protective sweep of a home to settings in which "(1) police officers are lawfully within private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable articulable suspicion that the area to be swept harbors an individual posing a danger."

[Davila, 203 N.J. at 102]. This Court has also imposed strict constraints on the duration and scope of the protective sweep in the residential setting. Ibid.; accord State v. Cope, 224 N.J. 530, [548 (2016)].

[Robinson, 228 N.J. at 545.]

As to the first element, relying on State v. Jefferson, 413 N.J. Super. 344 (App. Div. 2010), defendant argues the "police were . . . not lawfully inside the home" because they were required to "inform [her] that she had the right to refuse" consent for the officers to enter her apartment and "concededly" failed to do so. It is well-established in New Jersey case law that officers seeking to search a residence by consent must inform the occupant that he or she has a right to refuse the search. State v. Johnson, 68 N.J. 349, 353-54 (1975). This State's case law is not as clear, however, on whether officers must inform occupants they have a right to refuse the officers' request to simply enter a residence.

In Jefferson, we reversed the denial of the defendant's motion to suppress evidence seized from his apartment without a warrant. 413 N.J. Super. at 362. There, the police were investigating a citizen's tip of shots fired and located the suspected car of the alleged shooter in front of the defendant's residence, which was a multi-family dwelling. Id. at 349-50. An officer forcibly entered the dwelling by wedging herself into a slightly open door as the defendant attempted to keep her out by closing the door. Id. at 350-51.

A-3944-16T2

During the course of the struggle, the door struck the officer. Id. at 351. As a result, "[a]fter a brief but loud and violent struggle," the other officers "subdued and arrested" the defendant for the alleged assault. Ibid.

When questioned about the registered owner of the car police were investigating, the defendant identified the owner as his wife, Tiffanie Morrison, and told police she was in the second-floor apartment. Ibid. After the defendant was taken to police headquarters, the officers banged on the door of the second-floor apartment and the defendant's wife "opened the door with a child clinging to her leg." Ibid. "She and the child appeared to be afraid and upset." Ibid. In response to their inquiry, she told the police no one "else was in the apartment[,]" but "her eyes darted away from the police into the apartment, causing [one of the officers] to become concerned." Ibid. "The police asked if they could enter, and [she] gave permission." Ibid. Then, "[t]he police conducted a protective sweep of the apartment[,]" and "saw narcotics packaging materials and other possible evidence of narcotics" in plain view. Ibid.

Several hours later, Morrison consented to a search of the apartment, and the search "uncovered quantities of crack cocaine," id. at 352, which formed the evidential basis for the second-degree drug charge to which defendant subsequently "entered a conditional plea of guilty." Id. at 348. However,

[w]hen Morrison finally signed consent forms at 12:39 p.m., the police had already entered her apartment and conducted an unlawful sweep and plain view search. They had removed her and her child from her home. During the next two and a half hours, police officers remained inside her apartment while she was prohibited from re-entering. The police gave no indication of when their seizure of the home would end and when Morrison and her family might be permitted to return.

[Id. at 362.]

Beginning with the forced entry into the multi-family dwelling, we determined the police were not authorized to enter in the absence of "either a warrant or an exception from the Fourth Amendment's warrant requirement[,]" neither of which were present. Id. at 356. "Nor were the police authorized to enter [the] defendant's apartment to conduct a sweep for the presence of other persons," because "[a]lthough the police witnesses testified that Morrison granted permission for them to enter, they did not testify that she was advised of a right to refuse consent before the initial entry into her apartment." Id. at 360-61.

We explained:

Under the protections recognized in our State constitution against unreasonable search and seizure, N.J. Const., art. I, ¶ 7, Morrison's initial oral consent is not considered voluntary without proof that she knew she had a right to refuse. See State v. Domicz, 188 N.J. 285, 307 (2006); [Johnson, 68 N.J. at 353-54]; State v. Todd, 355 N.J. Super. 132, 138-39 (App.

16

> Div. 2002). The State bears the burden of proving her consent was voluntary, State v. Koedatich, 112 N.J. 225, 262 (1988) . . . ; State v. Chapman, 332 N.J. Super. 452, 466 (App. Div. 2000), and it did not satisfy that burden with respect to the first police entry into the apartment.
>
> [Jefferson, 413 N.J. Super. at 361.]

We concluded that "the search of the apartment some three hours after [the] defendant had been arrested was a violation of his constitutional right against unlawful search and seizure[,]" and "was the fruit of the unconstitutional entries into the hallway and the initial sweep of the apartment[.]" Id. at 362.

On the other hand, in State v. Padilla, 321 N.J. Super. 96, 108 (App. Div. 1999), aff'd o.b., 163 N.J. 3 (2000), we held that police officers did not have to advise the occupant that she had a right to refuse consent to enter the premises. In Padilla, officers received an anonymous phone call that three people had entered a motel room with a gun. Id. at 102-03. Three investigating officers knocked on the motel room door. Id. at 103. When a woman answered, one of the officers "identified himself and asked if the officers could enter." Ibid. The woman "said, 'okay' or 'yes[,]' and opened the door wider[.]" Ibid. The three officers entered and observed a gun, drugs, and drug paraphernalia in plain view, ultimately leading to the occupants' arrests. Id. at 103-04.

There, we held that "the police had the right, if not the obligation, . . . to investigate the report that a person with a gun was in the motel room[,]" and

that, as part of that investigation, "had the right to knock on the door and identify themselves for the purpose of continuing their investigation and making reasonable inquiries." Id. at 107. We saw "nothing unreasonable about [the officers'] request for permission to enter the room," and rejected the defendants' arguments that the woman's consent to enter the room was invalid because "the officers did not advise her of a right to refuse to consent." Id. at 108. We reasoned that unlike Johnson, 68 N.J. at 346, "the officers did not seek consent to search[,]" but "merely sought permission to enter to continue their investigation." Padilla, 321 N.J. Super. at 108.

Similarly, in State v. Pineiro, 369 N.J. Super. 65 (App. Div. 2004), we held that because a defendant "voluntarily admitted" investigators from the county prosecutor's office and the sheriff's office into his apartment, "the investigators' entry . . . was the same as that of any other social guest or business visitor, and did not constitute a Fourth Amendment search." Id. at 73. There, the defendant was a sheriff's officer who was observed on videotape removing a laptop computer from the trial court administrator's office. Id. at 68. Investigators from the sheriff's and prosecutor's offices obtained warrants for the defendant's arrest and to search his "apartment, motor vehicles[,] and locker[.]" Ibid.

However, when the investigators went to the defendant's apartment, they did not notify him of the warrants but simply said they were there "because there was a problem at work." Ibid. The "defendant admitted [the investigators] into the apartment" and was only informed of the warrants after the investigators observed a laptop computer and other possible stolen items inside the apartment. Id. at 68-69. We held that "[a]lthough the investigators had warrants to arrest defendant and search his apartment," they did not rely on the warrants to "gain entry to the apartment" but were "voluntarily admitted" by the defendant. Id. at 73. We explained that "because all the items were found in areas to which they had been voluntarily admitted by defendant[,]" the "seizure of these items would have been valid even if the investigators did not have a lawfully issued search warrant." Id. at 74.

Based on these divergent approaches, Jefferson on one hand and Padilla and Pineiro on the other, it is apparent that the occupant's knowledge of the right to refuse has not been required every time law enforcement officers seek consent to enter a residence. Notably, although Jefferson was decided after both Padilla and Pineiro, Jefferson did not address either case's holding.[8] Moreover, the cases cited in Jefferson to support the proposition that consent

---

[8] We also point out that while Jefferson was never appealed, the Court denied certification in Pineiro, State v. Pineiro, 181 N.J. 285 (2004), and affirmed Padilla on the record below. See 163 N.J. 3 (2000).

to enter the premises required the police informing the occupant of the right to refuse dealt with consents to search, rather than consents to enter. See Johnson, 68 N.J. at 353-54 (holding that if "the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent"); Domicz, 188 N.J. at 309-10 (declining to extend a requirement "that the police have a reasonable and articulable suspicion of criminal activity in a home to justify requesting consent to conduct a search of the premises"); Todd, 355 N.J. Super. at 139 (invalidating "the search of [a] fanny pack and seizure of its contents . . . on consent grounds" because the defendant's "assent . . . was not legally effective," inasmuch as there was "no evidence that [the] defendant had been informed that he had the right to withhold consent").

Similar to Padilla and Pineiro, other state courts in Washington and Mississippi—jurisdictions where the state constitutions afford protections comparable to New Jersey—have held, that an occupant's knowledge of the right to refuse entry is not required.[9] For example, in a case where a citizen informed officers that a defendant who had an outstanding arrest warrant could

---

[9] "Indeed, New Jersey is one of a small minority of jurisdictions in the country requiring the State to prove, as a precondition to the validity of a consent search, that a person have knowledge of his [or her] right to refuse to give consent." Domicz, 188 N.J. at 307.

be found at a local apartment, the Washington Supreme Court held that it was not "prudent or necessary" to extend the requirement that police advise occupants of their right to refuse entry every time an officer enters a home to investigate.  State v. Williams, 11 P.3d 714, 719-20 (Wash. 2000).

Instead, the Court recognized that "officers need to enter people's homes in order to provide their valuable services for the community on a daily basis[,]" and to require "that police advise citizens of their right to refuse entry every time a police officer enters their home[,]" would "unnecessarily hamper a police officer's ability to investigate complaints and assist the citizenry."  Id. at 720.  See also State v. Khounvichai, 69 P.3d 862, 864-67 (Wash. 2003) (holding that consent to enter was valid where the officers did not inform the occupant of his right to refuse entry because the sole purpose of entry was to question the occupant about a crime under investigation, as opposed to searching for contraband or evidence of a crime); State v. Dancer, 300 P.3d 475, 479-80 (Wash. Ct. App. 2013) (finding that officers were not required to inform occupants of their right to refuse entry when searching for a crime suspect whom the police reasonably suspected was on the premises).

Although knowledge of the right to refuse consent to enter was not explicitly addressed in Kleckner v. State, 109 So. 3d 1072, 1085 (Miss. Ct. App. 2012), the Mississippi Court of Appeals rejected a defendant's arguments

21

that his Fourth Amendment rights were violated when he was seized from his girlfriend's home without a search warrant. The court determined that, while armed with an arrest warrant for the defendant, the officers entered the girlfriend's home with her consent and found the defendant sleeping. Ibid. The court did not discuss or consider whether the girlfriend knew she had a right to refuse entry into her home, seemingly indicating that her informed consent was not a factor. Ibid. But cf. Carson v. State, 211 S.W.3d 527, 529-31 (Ark. 2005) (suppressing evidence of drug manufacturing that a plain-clothes officer found inside the defendant's residence because the officer did not advise the defendant that he had the right to refuse entry or refuse permission to search when the officer knocked on the defendant's door, identified himself with his badge, and asked if he could step inside to speak with the defendant).[10]

We are persuaded that in the circumstances presented here, there was no requirement that defendant be advised of her right to refuse entry to the police. Like Padilla, based on the information they received regarding the custody dispute and the possible presence of murder suspects in the apartment, the

---

[10] Like Washington and Mississippi, Arkansas' state constitution affords protections comparable to New Jersey's. See State v. Brown, 356 Ark. 460, 156 S.W.3d 722, 724 (Ark. 2004) (holding that "a home dweller must be advised of his or her right to refuse consent in order to validate a consensual search under the Arkansas Constitution").

officers were obligated to investigate. Thus, Chang's decision to knock, request permission to enter, and thereafter enter the apartment for further investigation was entirely reasonable and lawful. Further, like Pineiro, we are satisfied that defendant giving the officers permission to enter "was the same as that of any other social guest or business visitor, and did not constitute a Fourth Amendment search." 369 N.J. Super. at 73. Thus, we agree with the judge that the officers "did have a legitimate purpose to be present at the scene[,]" and are satisfied that those findings are supported by sufficient, credible evidence in the record. Because the officers obtained consent to enter the apartment and were "lawfully within private premises for a legitimate purpose," specifically, investigating a child custody dispute and ensuring the safety of the child, their presence in the apartment was constitutionally permissible, and satisfied the first element of a protective sweep. Davila, 203 N.J. at 102.

As to the second element, requiring "a reasonable articulable suspicion that the area to be swept harbor[ed] an individual posing a danger[,]" ibid., a reasonable suspicion must be "based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Gamble, 218 N.J. at 428 (quoting Michigan v.

Long, 463 U.S. 1032, 1049 (1983)). "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. 1, 27 (1968).

"[I]n determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." Ibid. "That determination is fact-sensitive and requires consideration of whether the totality of the circumstances provided the officer with an articulable and particularized suspicion" warranting the intrusion "within the context of the officer's relative experience and knowledge." Gamble, 218 N.J. at 432 (citing State v. Arthur, 149 N.J. 1, 7-8 (1997)).

Here, the judge concluded that, based on the totality of the circumstances, "the police . . . had credible evidence giving rise to a reasonable articulable suspicion that the area to be swept harbored individuals posing a danger." In support, the judge found that Alston provided two pieces of information that were verified as true by outside sources, namely, the court order confirming her residential custody of her niece, and police confirmation that the Brinson brothers had warrants for their arrest in connection with a murder in Irvington. Thus, the judge determined that Alston was "worthy of

24                                              A-3944-16T2

belief" when she informed police of the possible presence of her niece and the Brinson brothers inside defendant's apartment. These findings are supported by sufficient, credible evidence in the record and should not be disturbed. Equally well supported by the record is the judge's determination that the sweep was brief, cursory, and limited in scope to locations where an individual could hide. Thus, we agree with the judge's legal conclusion that the protective sweep was constitutionally permissible and discern no basis to intervene.

Turning to the consent search, to satisfy our Constitution, "any consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." State v. Carty, 170 N.J. 632, 639 (citing Johnson, 68 N.J. at 354), modified, 174 N.J. 351 (2002). The State bears the burden of proving "that the individual giving consent knew that he or she 'had a choice in the matter[,]'" State v. Hagans, 233 N.J. 30, 39 (2018) (quoting Carty, 170 N.J. at 639), and "the scope of a consent search is limited by the terms of its authorization." State v. Santana, 215 N.J. Super. 63, 72 (App. Div. 1987). Notably, "one required element of proof is that the consenting party must know that he [or she] has the right to decline consent." State v. Birkenmeier, 185 N.J. 552, 563-64 (2006) (citing Johnson, 68 N.J. at 353-54).

A-3944-16T2

"Consent is . . . a factual question to be determined from the relevant circumstances." Koedatich, 112 N.J. at 264. In State v. King, 44 N.J. 346 (1965), our Supreme Court set forth various non-exhaustive factors to guide the analytical framework, and concluded that in order for a search "[t]o be voluntary[,] the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" Id. at 352 (quoting Judd v. United States, 190 F. 2d 649, 651 (D.C. Cir. 1951)). Because determining "whether consent was voluntarily given is a factual issue," it is "to be decided by the trial judge; and the appellate court should reverse only when it finds that determination to be clearly erroneous." King, 44 N.J. at 354 (emphasis omitted).

Here, in concluding that defendant's consent to search the apartment was knowing, voluntary, and legally obtained, the judge credited Epstein's testimony, which was supported by the videotape of the entire consent process. See State v. S.S., 229 N.J. 360, 381 (2017) (extending the deferential standard of appellate review of the trial court's factual findings to "factual findings based on a video recording"). As a result, the judge found that defendant signed the consent form after it was read to her, that she was advised of her right to refuse consent, that she was allowed to speak to an individual at the scene and make a phone call to her attorney before consenting, and that she

was allowed to be present during the search. We discern no basis to disturb these specific findings, which are amply supported by the record.

Although not expressly articulated by the judge, absent from the record are any of the factors identified in <u>King</u> "as tending to show that the consent was coerced." 44 N.J. at 352. Specifically, when defendant gave her consent, she was not "an individual already arrested," or "handcuffed," she was not accused of anything, and had not "refused initial requests for consent to search[.]" <u>Id.</u> at 352-53. Moreover, there was no indication that "the subsequent search resulted in a seizure of contraband which [defendant] must have known would be discovered[.]" <u>Id.</u> at 352.

However, defendant does not argue that the judge erred in finding her consent voluntary.[11] Instead, defendant posits that because the "officers unlawfully entered the apartment, unlawfully conducted a protective sweep,

---

[11] In a footnote, defendant asserts the judge "did not cite to or analyze any of the [<u>King</u>] factors . . . to assess whether consent to search was voluntarily given." We do not consider an argument raised in a footnote. <u>Almog v. Israel Travel Advisory Serv., Inc.</u>, 298 N.J. Super. 145, 155 (App. Div. 1997) (refusing to address arguments made in footnotes because a party's "legal argument[s] [must] be made under 'appropriate point headings'" pursuant to <u>Rule</u> 2:4-2(a)(5)). As a consequence, defendant has effectively waived this argument on appeal. <u>See</u> <u>N.J. Dep't of Envtl. Prot. v. Alloway Twp.</u>, 438 N.J. Super. 501, 505-06 n.2 (App. Div. 2015); <u>El-Sioufi v. St. Peter's Univ. Hosp.</u>, 382 N.J. Super. 145, 155 n.2 (App. Div. 2005) (citing <u>In re Certification of Need of Bloomingdale Convalescent Ctr.</u>, 233 N.J. Super. 46, 48 n.1 (App. Div. 1989)).

and unlawfully seized the apartment and detained [defendant] outside for more than two hours[,]" the consent was tainted and "the evidence seized was 'the fruit of the unconstitutional [entry] and initial sweep of the apartment.'" Defendant continues that "[t]he connection between the consent and the unlawful search was not 'so attenuated as to dissipate the taint.'" Having determined that the initial entry and protective sweep of the apartment were both lawful and constitutionally permissible, we reject defendant's contention out of hand.

We do point out, however, that even if the initial entry and protective sweep were unlawful, the cocaine seized was not located as a result of either. Instead, the cocaine was found as a result of defendant's consent to search, which was obtained independent of the initial entry or protective sweep. Therefore, even assuming the initial entry and sweep were unlawful, the seizure did not arise, either directly or indirectly, from any unlawful police activity proscribed under the fruit of the poisonous tree doctrine. The fruit of the poisonous tree doctrine "excludes evidence seized as a direct consequence of unlawful police activity, as well as evidence subsequently discovered as a result of the illegality." Byrnes, New Jersey Arrest, Search & Seizure, 33.1-1 (2018-2019). Exceptions are "applied narrowly." Byrnes, 33:3.

When deciding whether or not to exclude evidence as fruit of the poisonous tree, "[t]he critical determination is whether the authorities . . . obtained the evidence by means that are sufficiently independent to dissipate the taint of their illegal conduct." State v. Pante, 325 N.J. Super. 336, 347 (App. Div. 1999) (citing State v. Johnson, 118 N.J. 639, 653 (1990)). In making that determination, a court should consider three factors: "(1) the flagrancy and purpose of the police misconduct; (2) the presence of intervening circumstances; and (3) the temporal proximity between the illegal conduct and the challenged evidence[.]" Ibid. (citations omitted). Of these three factors, "temporal proximity 'is the least determinative' factor," while "intervening events[] 'can be the most important factor in determining whether [evidence] is tainted.'" State v. Williams, 192 N.J. 1, 16 (2007) (second alteration in original) (first quoting State v. Worlock, 117 N.J. 596, 622-23 (1990); then quoting Johnson, 118 N.J. at 656).

Obtaining knowing and voluntary consent to search, as occurred here, can "constitute[] independent intervening circumstances sufficient to dissipate the taint of the primary illegality." See Pante, 325 N.J. Super. at 348. Thus, under these circumstances, the fruit of the poisonous tree doctrine would not bar the evidence found in the subsequent consent search. See United States v. Oguns, 921 F.2d 442, 447-48 (2nd Cir. 1990) (finding illegality of sweep did

A-3944-16T2

not taint consent to search because no evidence was seized until after consent granted); <u>United States v. Wellins</u>, 654 F.2d 550, 555 (9th Cir. 1981) (finding prior illegal "protective sweep" of hotel suite did not taint defendant's consent to search because defendant "had been permitted to consult with his attorney immediately prior to consenting to the search").

    Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3944-16T2